James Ross WEAVER, Jr. *v.* STATE of Arkansas

CR 90-203                                          806 S.W.2d 615

Supreme Court of Arkansas
Opinion delivered April 1, 1991

182

*Greene Law Offices*, by: *Bill Luppen*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. This is an appeal by appellant James Ross Weaver, Jr. from a conviction for capital murder and a sentence of life without parole in connection with the death of John Rogers. In December 1989 the appellant, who is age 19, and Rogers and a third party, Alan Hubbard, were roommates in a house in Little Rock. Ill will developed among the three, apparently relating to money and Rogers' failure to pay rent for several months. On the evening of December 13, 1989, the appellant and Hubbard went to the Caton residence to borrow an instrument which, according to the testimony of Al Caton, Sr., was for the purpose of "doing some collecting." Caton, Sr. says the appellant made that statement. A baseball bat was first requested, but Caton, Sr. refused. It is not clear whether the appellant or Hubbard made the request, but the appellant was present. Either Hubbard or the appellant then took a tire knocker owned by the Catons.

The appellant and Hubbard returned home that same night at about nine or ten o'clock and found Rogers socializing with a

few friends. What happened after that is not altogether clear but the salient points which are not disputed are that Hubbard, during the early morning hours of December 14, 1989, beat Rogers to death with the tire knocker, while Rogers was asleep on the couch. Hubbard then dragged the body to his car and placed the body in his trunk. What is in dispute is the extent of the appellant's help. The appellant says he did not see the beating but only heard it and saw Hubbard holding the instrument; Hubbard says the appellant was on the couch when it happened. The appellant says he did not assist Hubbard in dragging or carrying the body to Hubbard's car. Hubbard disputes this.

The appellant did drive with Hubbard to Cabot to dispose of the body and then helped Hubbard clean the house of bloodstains. He also took the tire knocker back to the Catons. The two men then moved out of the house and into an apartment, also in Little Rock.

On December 20, 1989, at approximately 11:30 p.m. two homicide detectives, Stafford and Oberle, and another police car arrived at the new apartment of the appellant and Hubbard and said they were investigating a missing person's report on Rogers. The detectives had been alerted to Rogers' absence by his girlfriend, who had contacted the Little Rock Police Department four or five days earlier. The detectives had also received a call from Rogers' employer who had seen blood on the front porch and front yard of the house and then returned the next day to find that the blood was no longer there. The detectives had investigated the premises earlier on the evening of December 20 before accosting the two men at their new apartment and found articles in the front yard (wood chips and a doormat) with blood on them.

Prior to the visit, the detectives had done a warrant check on both men and found an outstanding traffic warrant, a misdemeanor, on the appellant. At the apartment the detectives told the men that they needed to come to the police station to discuss the missing Rogers, and the men agreed. The appellant was further told that there was an outstanding warrant for his arrest on a traffic charge. The appellant rode with the detectives because of the warrant, and Hubbard rode in his own car. Detective Stafford testified that the men "volunteered" to go to the station, but the detectives made sure the men went to the station separately so

they could not develop "a story." Both detectives admitted that the appellant was not free to leave, had he decided not to go to the station voluntarily. Hence, neither detective told the appellant that he was free to go.

On the way to the police station, the appellant told the detectives "the whole story." There is a conflict in testimony, however, as to when the appellant received his *Miranda* warnings. The appellant does not recall receiving them at all in the squad car or ever being told he was a suspect for murder. Detective Oberle first testified that Detective Stafford advised the appellant of his rights "while we were in the car" and then testified, "Stafford told him his rights before we started talking to him about it orally." Oberle further said the appellant was advised of his rights even though they "really didn't know what crime had been committed." He admitted that it was not standard procedure to give *Miranda* warnings for a traffic violation. Detective Stafford's testimony is less precise:

> Counsel: When you got him in the car, you said you read him his Miranda Rights.
>
> Detective: I didn't immediately. I'd say about 65th and somewhere on 65th Street, between Butler Road and Geyer Springs.
>
> Counsel: What crime did you say that he was — had been charged with?
>
> Detective: Well, I noticed his demeanor about him. He was very nervous. I did ask him when was the last time he saw John. His statement, I forget, didn't coincide with what I already knew, and then about that time, I felt like there was foul play. Yes, and at that time I did advise him of his rights.
>
> Counsel: Did he first deny knowing anything about this?
>
> Detective: He said — He made a statement first that him and somebody got into a fight on Young Road that evening. He didn't know who was involved in the fight, but they took John with them.
>
> Counsel: Did you tell him, then, that you really

knew what had happened?

> Detective:   I said I felt like I know better than that. Because I said there was other evidence at the house that disproves what you're saying. And I can't remember all the exact words, but between the time we got on the interstate and the time we got down to the police station, I mean, we knew the whole story.

> Counsel:   He then made a statement?

> Detective:   Yes, sir.

> Counsel:   In the car?

> Detective:   Yes, sir.

When he advised the appellant of his *Miranda* rights in the car, Detective Stafford said he considered him under arrest from that point forward.

At the station shortly after midnight, the detectives gave the appellant his *Miranda* rights and the appellant said he understood his rights and signed a waiver form. He then made a twenty minute taped statement. The statement at the station occurred within an hour of the initial visit to the appellant's apartment. Hubbard gave a statement to the detectives about thirty minutes later. Then the appellant, Hubbard, and several additional detectives traveled to Cabot and retrieved Rogers' body.

The appellant was charged with capital murder on January 5, 1990, and was tried two months later on March 6, 1990. Prior to trial the appellant filed a motion to suppress his taped statement on grounds that it was tainted by a pretextual arrest and an earlier confession where *Miranda* was violated. The motion was denied. He also sought a continuance the day before the trial due to the unavailability of Hubbard, a prospective witness, who was undergoing a psychiatric evaluation at the State Hospital. That motion also was denied.

At trial, the prosecutor said in his opening remarks to the jury that they would hear the statement given by the appellant. The defense counsel did not object to the prosecutor's remark. Defense counsel then described the contents of the appellant's confession in his opening statement. The prosecutor, however,

later informed the court that he did not intend to introduce the appellant's statement at trial, and he did not do so. The only reference to the appellant's statement during the state's case was Detective Stafford's testimony that the appellant had directed him to where the body was. Defense counsel, again, did not object to this testimony.

Defense counsel did agree with the prosecutor to make Hubbard's statement to the police a joint exhibit. That gave Hubbard's version of the events and contradicted the appellant on whether he was in the room when Hubbard bludgeoned Rogers to death and whether he helped carry out the body.

The appellant was convicted of capital murder and sentenced to life without parole. On April 5, 1990, he filed a motion for a new trial arguing 1) insufficiency of the evidence and 2) the unconstitutionality of the capital murder statute. That motion was denied on June 12, 1990.

The appellant makes several arguments for reversal. We find that none of them has merit, and we affirm the conviction.

### Pretextual Arrest

The appellant first argues that the arrest for a traffic violation was pretextual and effected by the detectives only as a sham to interrogate him. There is no question in this case that the warrant was valid. There is dispute, however, over whether the appellant was arrested on that warrant on the evening of December 20. Regardless of whether he was or not, in light of what the detectives knew before contacting the appellant, they could readily have formed a reasonable suspicion that the appellant had committed a felony under A.R.Cr.P. Rules 2.1 and 3.1. Rogers was missing. Rogers' employer had seen blood on the appellant's front porch and yard which was gone the next day. The detectives themselves had found blood on the premises. The appellant and Hubbard had changed residences, shortly after Rogers' absence. The two men were definitely suspects in the eyes of the detectives.

Under these circumstances and based on what the detectives knew, they had grounds to detain the appellant without arrest for a reasonable time under Rule 3.1 as part of their investigation into foul play. Accordingly, the detectives' failure to

make it clear that the appellant did not have to go to the station for questioning and was free to go at any time is largely irrelevant.

Since the traffic warrant, Which might have been pretextual under different circumstances, was not necessary for detention, the warrant did not taint or color the events that followed. We hold the appellant could have been legitimately detained under A.R.Cr.P. Rule 3.1 for a reasonable period of time and the time detained before arrest was reasonable in this case.

### Custodial Statement

■■ We have held that a police inquiry is purely investigatory and proper until the suspect is restrained in some significant way. *Shelton v. State*, 287 Ark. 322, 699 S.W.2d 728 (1985). We have further said, "[C]ustodial interrogation means not only actual arrest but also any conduct that deprives a person of his freedom of action in any way." *Reeves v. State*, 258 Ark. 788, 794, 528 S.W.2d 924, 927 (1975). Custodial statements are presumed involuntary, and the state has the burden of demonstrating their admissibility. *Moore v. State*, 303 Ark. 1, 791 S.W.2d 698 (1990); *Rose v. State*, 294 Ark. 279, 742 S.W.2d 901 (1988); *Jackson v. State*, 284 Ark. 478, 683 S.W.2d 606 (1985). In determining admissibility we review the totality of the circumstances and will reverse only when the trial judge's finding of voluntariness is clearly against the preponderance of the evidence. *See Scherrer v. State*, 294 Ark. 227, 742 S.W.2d 877 (1988).

In the *Shelton* case, we repeated the test that the United States Supreme Court had recently announced:

> It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." . . . A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

287 Ark. at 328-329; 699 S.W.2d at 731; *quoting from Berkemer v. McCarty*, 468 U.S. 420, 440, 442 (1984).

The facts of the *Shelton* case are similar to the facts of this case in many important respects. In that case the defendant, who was age 17, a friend of his, and an older man had burglarized a church, and the defendant and his friend had then watched the older man murder a police officer. The older man was killed in a later shootout with the police. In the meantime investigating officers visited the boys and told them that the older man had killed a policeman. They asked the boys to show them where their parents lived and at one house, the defendant was left in the police car alone with one officer. *Miranda* rights were not mentioned. The officer urged the defendant to help them locate the older man, whereupon the defendant confessed what he had seen. Later at the police station, the defendant was read his *Miranda* rights, which he waived in writing, and he then gave a second statement to the police. There was no appreciable lapse of time between the two statements and no substantial change in environment, so as to interrupt or alter the conditions existing during the first statement.

In our decision in *Shelton* we focused on the place of the questioning and the age and the intelligence of the defendant, and we noted that a police car is a significant factor in finding that a person was undergoing custodial interrogation. We then held that statements by the defendant after the police officer encouraged him to talk were not properly admitted. We further held that the second statement given at the police station should also be excluded. We said on that point, "When the original confession has been made under illegal influence, such influence will be presumed to continue and color all subsequent confessions, unless the contrary is clearly shown." 287 Ark. at 331; 699 S.W.2d at 733.

In a case similar to *Shelton*, a teenage defendant, age 19, was not advised of his *Miranda* rights in advance of the first confession made in his home, but only subsequently in connection with a second confession. *Oregon v. Elstad*, 470 U.S. 298 (1985). The United States Supreme Court upheld the second confession, saying:

> We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission

does not warrant presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

470 U.S. at 314.

In the case before us, unlike *Shelton* and *Elstad, Miranda* warnings were given according to the detectives. The two detectives did contradict one another on when this happened, though both testified that it occurred in the squad car. Detective Stafford, who was in a better position to remember because he did the questioning, said the warnings were not given immediately but only after the appellant lied about the whereabouts of Rogers.

The appellant testified that he was never read his rights in the car. He did recall that Stafford referred to bloodstains on the carpet, and, after that, he confessed:

> Counsel: Had he read you any Miranda Rights at that point?
>
> Appellant: No, I don't remember if he had. He did ask me if I knew anything about the disappearance of John Rogers, and at first I did lie to him, and I told him that I didn't know where he was. And he said that he knew that there was something, you know, there was something else. Because of — He stated that there was bloodstains on the carpet. At that time, I confessed, and I told him the truth.
>
> Counsel: Then what happened? Did they read your Miranda Rights then? In the car?
>
> Appellant: No, I don't remember that.

The appellant, nevertheless, admits that he was advised of his *Miranda* rights at the police station minutes later, and he gave a second taped confession which lasted twenty minutes.

In examining the totality of the circumstances, as we are required to do, we cannot say that the appellant's second

confession, which was taped, was tainted by the events surrounding the first. The questioning in the squad car did constitute custodial interrogation and the appellant was 19 at the time and nervous. Moreover, the taped confession followed only minutes later in the police station, which does not suggest a significant interruption in custodial circumstances. Balanced against those circumstances is the testimony of Detective Stafford regarding *Miranda* and the appellant's own admission that he confessed after Stafford mentioned the bloodstains on the carpet and said the appellant was not telling the truth about where Rogers was. Stafford says at that point he advised the appellant of his rights and considered him under arrest.

The *Shelton* case differs from these facts in two respects. First, no warnings were given in *Shelton* before the first statement. Detective Stafford, however, testified he gave the *Miranda* warnings. The appellant denies this, but the trial judge gave credence to Stafford's testimony. Secondly, nothing in the record even suggests that the appellant, though only slightly older than Shelton (19 versus 17), was of marginal intelligence and maturity as Shelton was. That factor was troublesome in *Shelton* to both the trial judge and this court in deciding the admissibility of the boy's confession.

We hold, therefore, that the finding of the trial judge on the voluntariness of the taped confession was not clearly contrary to a preponderance of the evidence.

### Compelled Testimony

The appellant asserts that the prosecutor's comment ("You'll hear the statement James Weaver gave as well") compelled his counsel to disgorge the contents of the taped confession in his opening remarks. This compulsion, according to the appellant, ran afoul of our previous holding in *Clark* v. *State*, 256 Ark. 658, 509 S.W.2d 812 (1974). In *Clark*, however, the prosecutor referred to the defendant's taking the stand, and when he did so, defense counsel moved for a mistrial. No reference was made to the defendant's actually testifying at trial in this case, and a mistrial motion was not made. Defense counsel outlined the appellant's statement to the jury, apparently, as a matter of trial strategy. He certainly was not required to do this. He had also agreed, before trial, to the joint introduction of Hubbard's

statement, which described Hubbard's version of the murder, burial, and house cleanup. We find no compulsion to testify under these facts.

### Narrowing of Capital Murder Statute

■ The appellant argues that the trial court should have granted his motion to dismiss, because the Arkansas capital murder statute is unconstitutional in that it fails to adequately narrow the category of death cases and distinguish that narrow category from "non-death" cases. The appellant did not receive the death penalty in this case. Therefore, he lacks standing to point to errors having to do with the jury's consideration of the death penalty. *See Ward* v. *State*, 298 Ark. 448, 770 S.W.2d 109 (1989).

### Overlapping Statutes

■ The appellant also argues that the capital murder statute is unconstitutional because it makes criminal the same intent found in the first degree murder statute. This overlapping between "premeditation and deliberation" in the capital murder statute and "purpose" in the murder one statute renders the two statutes void for vagueness, according to the appellant. We have also dispensed with this argument in previous cases and uphold those cases today. *See Penn* v. *State*, 284 Ark. 234, 681 S.W.2d 307 (1984); *Simpson* v. *State*, 274 Ark. 188, 623 S.W.2d 200 (1981).

### Continuance

■■ The appellant moved for a continuance the day before the trial on the basis that Hubbard, the actual perpetrator of the bludgeoning, according to the appellant, was undergoing a mental evaluation and was unavailable to testify. Under our criminal rules, the court shall grant a continuance only for good cause. A.R.Cr.P. Rule 27.3. Among the factors to be considered by the trial court are: 1) a movant's diligence; 2) the probable effect of the testimony at trial; and 3) the likelihood of procuring the witness's testimony in the event of postponement. *See Thacker* v. *State*, 253 Ark. 864, 489 S.W.2d 500 (1973). The decision of whether to grant a continuance lies in the sole discretion of the trial judge, and we will reverse only in cases of

abuse. *Id.*

█ Here, there is no assurance that Hubbard ever would have testified about his role in the slaying in view of his Fifth Amendment rights against self-incrimination. Also, defense counsel seemed to suggest at the continuance hearing that Hubbard's acquittal for lack of mental capacity or on some other ground might favorably impact the appellant's trial. The appellant as an accomplice does not have the right to demand that the principal be tried first. Moreover, accomplices have been found guilty, when the principals have been exonerated. *See, e.g., Blann* v. *State*, 15 Ark. App. 364, 695 S.W.2d 382 (1985); *see also* Ark. Code Ann. § 5-2-405(2) (1987).

Finally, the appellant did formally introduce Hubbard's statement given to the detectives. Admittedly, the statement was not subject to cross-examination, and it further contained inculpatory comments for the appellant. Nevertheless, the defense counsel, on balance, considered Hubbard's statement favorable to the appellant, and to some extent it brought to the jury's attention the point that the defense counsel wanted to emphasize — that the appellant's role was that of an accomplice.

█ We affirm the trial court's denial of the continuance under these circumstances.

### Sufficiency of the Evidence

█ The appellant moved for a new trial on the basis that the verdict was contrary to the weight of the evidence. The appellant, however, did not move for a directed verdict at the close of all the evidence. Our rules are clear that failure to move for a directed verdict at the conclusion of the state's case and again at the conclusion of the case as a whole constitutes a waiver of any sufficiency of the evidence claim. A.R.Cr.P. 36.21(b); *see also Hayes* v. *State*, 298 Ark. 356, 767 S.W.2d 525 (1989).

All other objections decided adversely to the appellant have been reviewed under Ark. Sup. Ct. R. 11(f), and no error has been found.

Affirmed.

DUDLEY, J., not participating.