Bob HARRIS *v.* STATE of Arkansas

CR 94-1273                                        899 S.W.2d 459

Supreme Court of Arkansas
Opinion delivered June 5, 1995

*Stockland & Trantham, P.M.*, by: *Charles S. Trantham*, and *Batchelor & Batchelor*, by: *Fines F. Batchelor, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

Tom Glaze, Justice. On April 22, 1994, a jury found Bob Harris, thirty-six years old, guilty of having engaged in sexual intercourse or deviate sexual activity with a girl who was under fourteen years of age. He received a cumulative sentence of more than thirty years imprisonment. Harris appeals, setting out seven points for reversal. None has merit.

We first consider Harris's argument that the trial court abused its discretion in denying his motions for continuance and new trial. He points out that the state's original information filed on December 3, 1993, accused him of committing rape between the 15th of April and the 15th of August, 1993. On January 10, 1994, Harris filed a motion for specific facts, information and materials. In early and mid-March of 1994, Harris filed motions for discovery, sanctions, and a hearing and continuance, and on March 25, 1994, the state responded by furnishing Harris with answers and materials that Harris had requested. The state further informed Harris's counsel of the prosecutor's open file policy, inviting him to inspect the state's entire file. Harris continued to request more time, information and sanctions and added a motion in limine, seeking to prevent Dr. James Green from testifying that the alleged victim had said that Harris had sexual contact with her.

On April 18, 1994, three days prior to trial, the trial court considered Harris's continuing motions, information furnished by the state and argument of counsel, and it denied Harris further relief. At the same hearing on April 18, the trial court, prosecutor and defense counsel discussed that Harris had requested the specific dates on which the sexual contacts were alleged to have occurred, and the prosecutor responded that the acts occurred on the nights and weekends the victim and her siblings had stayed with Harris in 1993. The prosecutor indicated that the period probably began in February 1993. The court asked the state if it would amend its information to which the prosecutor said, "I may have to, I think it goes back further." One day before trial, the prosecutor amended the information, reflecting that the dates of the offense occurred between February 19 through September 15, 1993, rather than between the April 15 through August 15 dates set out in the original information. Harris objected to

the state's amended information and again requested a continuance, but the trial court overruled Harris's objection, stating that the defense previously had been notified that the information would need to be amended to reflect new dates. On appeal, Harris concedes the amended information did not change the nature or degree of the crime with which he was charged. Nevertheless, he argues that, if he had known of the new dates, he could have furnished witnesses to rebut the victim's testimony that they had sex on February 19, 1993.[1]

By statute and case law, it is established that generally the time a crime is alleged to have occurred is not of critical significance unless the date is material to the offense. *Fry* v. *State*, 309 Ark. 316, 829 S.W.2d 415 (1992). That is particularly true with sexual crimes against children and infants. *Id.* In *Fry*, the state charged Fry with having raped ten and nine-year-old victims "on or about June or July, 1989." However, one of the victims testified she was living with her mother and stepfather, Fry, and attending school which was "about the end of May." The victim further said that "along those days, Fry would put his hand inside my underpants, stick his finger inside of me, between my legs and move it up and down." She said that it happened more than once, but not after school was out.

Fry contended he was entitled to a directed verdict since the state alleged the offenses occurred in June or July, but the victim testified the incidents did not occur after school was out at the end of May. In rejecting Fry's argument that the trial court erred in denying his motion, this court related that the victim's testimony that school was out "around the end of May" is not a categorical certainty and school may have extended over into June. The court added that, giving that proof a margin of error produces no prejudice to Fry, whose defense was that the alleged incidents with the victims never occurred and were entirely fabricated.

In the present case, the victim testified on direct that Har-

---

[1]Harris claims he had no time to procure a doctor to explain Harris had sustained an injury that rendered him unable to have performed the sexual acts on the February date alleged. In addition, he contended that, with more time, he could have checked records to show the victim, her mother and siblings and friends were wrong with respect to the February date.

ris first sexually abused her sometime in February and on cross-examination, she said, "It was approximately February 19." Like the defense in Fry, Harris's defense here is that the offenses never happened. And concerning the February date in issue, the victim merely related that one of the incidents occurred "around the nineteenth."

We also find the case of *Huffman* v. *State*, 288 Ark. 321, 704 S.W.2d 627 (1986), helpful. There, Huffman was charged with deviate sexual activity with a girl under the age of eleven. Huffman argued that the trial court should have granted a continuance when, just before the trial began, the state amended its information to allege that the crime occurred between November 1, 1983 and January 15, 1984. Citing Ark. Stat. Ann. § 43-1015 (Repl. 1977) [now Ark. Code Ann. § 16-85-405(d)(1987)], this court rejected Huffman's argument, stating that, in a case of this kind, the particular time is not an ingredient of the offense, so the amendment was permissible. The court pointed out that the prosecutrix testified that there was intercourse both before and after Christmas (1983).

Here, as noted above, the victim testified on direct that Harris sexually abused her in February 1993, and it occurred on the first occasion when she stayed overnight at Harris's house. She could offer no exact date, but recalled the first incident occurred on the second day of her having first stayed at Harris's. She thought she had spent three nights at the Harris house, and Harris had sex with her on the second and third nights. Although she testified Harris first had sex with her in February 1993, she then related other sexual encounters, ending in September 1993, when she spent weekends at the Harris abode. Other incriminating evidence was introduced including a card and numerous letters from Harris to the victim. The card began, "Know where I'd Like to Be Right Now? Between *you* and this card." The letters were replete with terms of affection and love, in one was included a post script, "P.S. Hope you don't wear your birthday suit to school on your birthday. That's my suit! (he he) I Love You!"

Prior to trial, the state revealed all the evidence it had to Harris's counsel concerning what the young prosecutrix had said as to when she claimed Harris first had sex with her. That was to have occurred in February 1993. While Harris, for defense

purposes, would like to limit the girl's claim to having first had sex with him on the February 19 date set out in the amended information, he knew quite well that the girl's allegations covered her first weekend stay over at Harris's house. In this case, the particular time is not an ingredient of the offense with which Harris was charged, nor can we conclude the circumstances here show Harris was prejudiced by the amended information.

In another argument, Harris refers to the Fifth, Sixth and Fourteenth Amendments and asserts the trial court should have quashed the entire jury panel because the panel did not reflect the composition of the community at large.[2] He says that of the 385 names drawn for the jury panel, only 112, or 29%, were ever assigned to jury duty and the remainder were never served, excused or they never appeared. He said that, for unexplained reasons, fifty-eight persons were listed on the jury panel for his case, but only forty-four appeared. Harris moved to quash the jury panel, but the trial court denied the motion, stating that the forty-four jurors present were plenty.

Harris cites *Lockhart* v. *McCree*, 476 U.S. 162 (1986), for the proposition that, when large sectors of the public are excluded from the jury panel, that alone contravenes the fair-cross-section requirement and dictates reversal. First, we need mention that *Lockhart* dealt with death-qualified juries, and the Supreme Court there merely held that such juries do not violate the fair-cross-section requirement of the Sixth Amendment. *Lockhart* has little application to the situation now before us. The *Lockhart* court did, however, announce that the essence of a "fair-cross-section" claim is the systematic exclusion of a "distinctive group" in the community, but such a group is not defined in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors. *Id.* at 174. Here, at the time the jury was selected, Harris's objection to the jury panel focused only on the limited number of jurors assigned to the panels, not to the exclusion of any distinctive group. He waited until after trial in his motion for new trial to raise his contention that the limited number of assigned jurors somehow deprived him of peers of his own age group "who

---

[2]Harris never questioned whether the statutory procedures for empaneling petit jurors were followed.

would be expected to better understand his position in this case." Harris's objection was untimely. *See Smith* v. *State*, 318 Ark. 142, 883 S.W.2d 837 (1994). However, timeliness aside, he offers no criteria used to determine the boundary limits when defining the "age group" excluded or that such an age group was systematically excluded. Nor does Harris cite legal authority or present convincing argument that such an age group falls within a "distinctive group" in the community as is required under the fair-cross-section component of the Sixth Amendment.

In reviewing the record, we recognize an apparent problem existed in the jury selection process since only a limited number of jurors were assigned and appeared for jury duty. The trial courts are obliged to correct any such problems when the selection process is properly challenged and timely brought to their attention. Nonetheless, in the situation at hand, we hold no deliberate or systematic exclusion of any distinctive class was timely shown, nor did Harris show he was prejudiced by the selection process. *See Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984); *see also Ruiz* v. *State*, 299 Ark. 144, 772 S.W.2d 297 (1989), (where 403 venirepersons were subject to call as potential jurors, but 198 were excused by the trial judge for various reasons and some could not be contacted or were thought to be dead or unavailable, leaving only 90 to show up for the jury selection, the trial judge was held not to have abused his discretion in granting excuses or in depriving the defendants of a jury representing a fair-cross-section of the community).

Harris also claims error because, on voir dire, one of the jurors failed to reveal he was a candidate for sheriff. He urges that the fact the juror was seeking the office of sheriff created or evidenced a bias towards Harris. We cannot agree.

A potential juror may be challeged for cause if he or she is actually biased. This court has held that a venireperson is actually biased if he or she cannot try the case impartially and without prejudice to the substantial rights of the party challenging. *Henry* v. *State*, 309 Ark. 1, 828 S.W.2d 346 (1992). This determination lies within the sound discretion of the trial court. *Id.*

Here, on voir dire, the questioned juror was never asked if he was a candidate, but he did disclose he was the chap-

lain for the sheriff's department. When asked if there was anything known to him that would present any problem in rendering a fair and impartial jury verdict, the juror said no. On this point, Harris presents no legal citation or authority that a juror may be presumed biased merely because he chose to run for sheriff or any other office. Authority does exist which holds that bias will not be presumed merely because a juror works in law enforcement. *Tinsley* v. *Borg*, 895 F.2d 520 (9th Cir. 1990). In sum, Harris fails to show that the trial court abused its discretion in refusing to exclude the juror challenged by Harris.

Harris's next argument challenges the trial court's admission of a medical report into evidence. That report contained the victim's statements to Dr. James Greene that she had had sexual intercourse with Harris. Below, Harris contended that the report contained inadmissible hearsay that deprived him of his rights under the Fifth, Sixth and Fourteenth Amendments. On appeal, however, he asserts the state failed to lay a proper foundation for admission of the medical report as a Business Record exception under Rule 803(6) of the Uniform Rules of Evidence. It is well settled that arguments not raised at trial will not be addressed for the first time on appeal and that parties cannot change the grounds for an objection on appeal, but are bound on appeal by the scope and nature of their objections as presented at trial. *Stricklin* v. *State*, 318 Ark. 36, 883 S.W.2d 465 (1994).

In his fifth argument, Harris complains that he was not allowed to testify that the victim's father, Frank Brock, physically abused her and her siblings and that Harris's actions were consistent with helping the family escape from that abuse. The record, however, reflects considerable testimony was elicited concerning the father and how he physically abused his children. Harris testified how Brock had jerked and thrown his daughter around, one time causing her to sustain a cut arm. Brock's son also related that his father had whipped him with a belt and left stripes on his back. A state police officer also testified that Brock had beaten and roughed up his children. This and other evidence was introduced at trial, and we fail to see how, in any significant way, Harris failed to get what he wanted on this issue before the jury. Harris suffered no prejudice.

■ Harris's final argument involves his claims that the statutory bifurcation process is unconstitutional because (1) no appellate review of his sentence is provided, (2) the process contains a "sunset provision," (3) the process denies him the right to confront and cross examine witnesses, (4) the process does not allow for voir dire regarding possible sentences and (5) the bifurcation law violates the *ex post facto* clause.[3] Below, Harris made a general objection to a bifurcated trial by stating the following:

> And, if the Court please, it is further respectfully submitted that such statute is unconstitutional and in violation of the Arkansas and Federal Constitutions, particularly, Amendments Five, Six, and Fourteen to the United States Constitution, and similar provisions of the Arkansas Constitution, in that they do not permit the defendant's jury trial as contemplated by the constitutional provisions.

As is readily discerned from his objection, Harris failed to preserve at trial the specific constitutional questions he now seeks to advance in this appeal. This court does not consider arguments which are not supported by compelling argument or citations of law. *Keifer* v. *State*, 297 Ark. 464, 762 S.W.2d 800 (1989). We do point out, however, that this court recently fully addressed and rejected the *ex post facto* argument in *Williams* v. *State*, 318 Ark. 846, 887 S.W.2d 530 (1994).

For the reasons above, we affirm.

---

[3]Harris sets out a seventh point, but it concerns the trial court's denial of his motion for new trial and merely covers issues already addressed.