Wilford Gene JOHNSON, Jr. *v.* STATE of Arkansas

CR 95-1071 926 S.W.2d 837

Supreme Court of Arkansas
Opinion delivered July 1, 1996

*James R. Marschewski,* for appellant.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Wilford Gene Johnson, Jr., was convicted of the first-degree murder of Joe Cheek, who was bludgeoned to death on April 25, 1994. He was sentenced to life imprisonment. In this appeal, Johnson raises four points for reversal.

Johnson confessed to killing Cheek, but he argues the trial court erred in denying his motion to suppress the introduction of his confession because police officers failed to comply with Ark. R. Crim. P. 2.3 or to properly advise him of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436 (1966). We first address his Rule 2.3 argument. That rule provides as follows:

> If a law enforcement officer acting pursuant to the rule requests any person to come to or remain at the police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

■ This court considered Rule 2.3 in *Burnett* v. *State*, 295 Ark. 401, 749 S.W.2d 308 (1988), where the court reversed Burnett's conviction, holding he had been unlawfully seized without probable cause at his home in violation of the Fourth Amendment and Rule 2.3. Specifically, the court held that the six arresting officers had failed to comply with Rule 2.3, which requires that an officer inform a person he is free not to accompany the officer if the officer does not have a warrant. The *Burnett* court set out the following test established in *United States* v. *Mendenhall*, 446 U.S. 544 (1980), when determining whether one has been unlawfully seized:

> We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, the physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.* (Emphasis added.)

The court in *Burnett* further relied upon the following rationale in *Dunaway v. New York*, 442 U.S. 200 (1979), where the court held Dunaway's detention amounted to an arrest:

> In contrast to the brief and narrowly circumscribed intrusions involved in those cases [*Terry* v. *Ohio, supra,* and similar decisions], the detention of petitioner was in important respects indistinguishable from a traditional arrest. *Petitioner* was not questioned briefly where he was found. Instead, he *was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go,' indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.* The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law. *The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, [cite omitted] obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in Terry* and its progeny. Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause. (Emphasis added.)

Using the foregoing *Mendenhall* test, the *Burnett* court held that a reasonable person in Burnett's position would have thought that he had no choice except to accompany six officers to the police station. The court determined that, although the officers said Burnett was not arrested when he was picked up at his home, he was simply told to get his clothes on and come to the station. None of the six officers informed Burnett he could stay at home.

In reviewing a trial judge's ruling on a motion to suppress, we review the evidence most favorable to the appellee, *Beshears v. State*, 320 Ark. 573, 898 S.W.2d 49 (1995). Here, the record reflects that, on April 26, 1994, the day after Cheek's murder, Officers Jay Rider and Lanny Reese were at the crime scene, an alley, where they observed Johnson looking for something. The officers talked to him briefly, and asked him if he would come to the police station for an interview. At the station, Johnson was read

his rights, and after giving the officers some general information, he asked if he could leave. He was told that he was free to leave at any time. Johnson then told the officers that, on the night of April 25th, he had been drinking with Cheek and two other guys in the alley where Cheek's body was later found. He said that sometime that night he could not locate his bedroll, and, while he felt Cheek had done something with it, Cheek would not tell him where the bedroll was. Johnson then left Cheek and the other men, and spent the night at the Salvation Army. Johnson explained to the officers that he had returned to the alley the next day to continue his efforts to find his bedroll. After relating his story to Rider and Reese, Johnson asked if he was under arrest, and was told no and was again told he was free to go at any time. A short time later, the officers, once again, informed Johnson that he was free to go, and he left.

On May 1, 1994, Officer Howard testified that he directed an on-duty officer to find Johnson and tell him that "we simply want to talk to him; that he was not under arrest." Officer Smalley located Johnson, asked him if he would come down to the station and was told he was not under arrest. No rights were read to Johnson, and no statement was taken. During his interview, Johnson tracked his earlier story that Cheek was alive when Johnson left him on the night of the 25th. Johnson was told that the officers would like to talk to him again if he would come back the next day, May 2nd. No time was set, but Johnson returned about noon, May 2. Officer Howard advised Johnson that he was not under arrest and said, "you're here of your own free will." The officers did not read Johnson his rights; Johnson's story remained the same — that Cheek and the other two men were present and alive when he left them the night of April 25.

After telling his story again, Officer Reese testified that Johnson was free to leave, but did not do so. Officer Howard further testified that by now [May 2, 1994] Johnson knew where the restrooms, water fountains and coffee pot were, and he was free to come and go as he pleased — "he's been advised of that fact." Shortly after Johnson repeated his story and when Reese expressed his own thoughts that "somebody had gotten in an argument with Cheek" and used a metal bar to murder Cheek, Johnson volunteered, "No, it was a two-by-four." At that point Officer Howard stopped the interview and read Johnson his rights. Johnson then gave an incriminating statement which, at trial and on appeal, he

seeks to have suppressed.

In summary, on April 26, 1994, Officers Rider and Reese were investigating the crime scene when they saw Johnson looking for something in the alley and, as a consequence, they asked him if he would come to the police station for an interview. At the station, Johnson was read his rights, and during his interview, Johnson was told three times that he was not under arrest and was "free to leave at any time." Johnson left shortly after he was told the third time that he was free to go. On May 1, Officer Smalley found Johnson to ask him "if he would come down to the station," and at the same time, he told Johnson he was not under arrest. And lastly, Johnson was asked "if he could return the next day," which he did at a time of his choice, about noon.

■ Considering the totality of the circumstances, it is clear Johnson was well informed that he was never under arrest, and was free to leave the police station and to come and go when he pleased. He was never threatened verbally or physically by the officers, nor was he ever informed he would be physically restrained if he refused to appear at the station. Rule 2.3 does not provide that a person must repeatedly be advised that he has no legal obligation to come to the police station each time he agrees to appear for an interview or questioning. In fact, even in situations where *Miranda* warnings might have been required, no such constitutional requirement exists that warnings be repeated each time a suspect is questioned. *Bryant v. State*, 314 Ark. 130, 862 S.W.2d 215 (1993). We conclude that the officers' actions complied with the requisites of Rule 2.3 and the Fourth Amendment and offer Johnson no valid grounds for suppressing his confession.

■ Johnson's second argument bears on the officers' failure to advise him of his *Miranda* rights on May 2 before he disclosed Cheek had been beaten by a two-by-four. However, it is settled that the safeguards prescribed by *Miranda* be applicable as soon as a suspect's freedom of action is curtailed to "a degree associated with formal arrest." *State v. Spencer*, 319 Ark. 454, 892 S.W.2d 484 (1995). As discussed by us in addressing Johnson's Rule 2.3 argument, the record reflects he was never taken into custody or otherwise deprived of action in any significant way either prior to or at the time he made his incriminating statement on May 2nd. That being so, the officers' repetition of *Miranda* warnings to Johnson on

May 2 before his confession was not required.[1]

■ Johnson's next point is that his confession should have been suppressed because the state failed to provide all of the material witnesses at the suppression hearing who had been present when Johnson gave his inculpatory statement. *See Griffin v. State*, 322 Ark. 206, 213, 909 S.W.2d 625, 629 (1995). He asserts Officer Rider and Detectives Lonetree and Risley were not listed or produced as state witnesses at the Denno hearing even though they were material witnesses who were connected with the controverted confession. As Johnson points out, the court has held that, whenever an accused offers testimony that his confession was induced by violence, threats, coercion, or offer of reward, the state has the burden to produce all material witnesses who were connected with the controverted confession or give an adequate explanation of their absence. Here, although Johnson by motion challenged the admission of his confession into evidence based upon Rule 2.3 and *Miranda* grounds, he never made a motion or obtained a ruling questioning the voluntariness of his confession. Nor did he argue or testify at the suppression hearing that his confession was coerced or involuntary.[2] Because Johnson failed to make the involuntariness-material witness argument below, he is barred from having it considered for the first time on appeal. *See Harris v. State*, 320 Ark. 677, 899 S.W.2d 459 (1995).

In his final argument, Johnson argues the trial court erred in not granting a mistrial because the state violated Rule 17.1(a)(ii) of the Arkansas Rules of Criminal Procedure which requires the state to disclose any written or recorded statements and the substance of any oral statements made by the defendant. Johnson's argument centers on Officer Rider who did not testify at the Denno hearing below, but did testify at trial, relating that he had participated in the

---

[1] We note that Johnson also argues that he had been seized for Fourth Amendment purposes when, during his interview on May 2, an officer saw what he believed to be blood spatters on Johnson's shoes. Johnson consented to the taking of his shoes, but the officer said he was still free to leave. An officer offered to buy Johnson some shoes, but Johnson refused. This testimony was elicited at trial, and not the suppression hearing, so this part of Johnson's argument was not before the trial court at the suppression hearing when the trial court denied Johnson's motion to suppress.

[2] We note that Johnson generally mentioned "Rules 3.1, 4 and 13.1 of the Arkansas Rules of Criminal Procedure and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 2, Section 8 of the Arkansas Constitution."

earlier questioning of Johnson at the police station. Rider testified that, during his interview of Johnson, he challenged Johnson to swear on a Bible that he did not kill the victim, but when he presented a Bible to Johnson, Johnson declined to do so. Johnson's counsel moved for a mistrial which the trial court took under advisement. In later denying Johnson's motion, the trial court offered Johnson a continuance to which defense counsel responded he did not need a continuance, and stated it was too late to do any "damage control."

 The law is settled that a mistrial is a drastic remedy to which resort should be had only when there has been an error so prejudicial that justice cannot be served by continuing the trial. *Reel v. State*, 318 Ark. 565, 886 S.W.2d 615 (1994). The decision whether to grant a mistrial is within the sound discretion of the trial court. *Id.* Here, Johnson's argument must fail for several reasons. First, Johnson's abstract fails to reveal he made a discovery request for any oral statements that he may have made. Second, in reviewing Rider's trial testimony, it appears Rider related the Bible incident during direct examination, but counsel first objected when Rider again mentioned the Bible incident on cross-examination. It is clear that an objection must be made at the first opportunity to do so or it is waived. *Watkins v. State*, 320 Ark. 163, 895 S.W.2d 532 (1995). But, more important, Johnson fails to argue what manifest prejudice occurred from the Bible-incident reference, especially since that testimonial reference pales in significance to the confession testimony already given by Rider and others that Johnson said he had killed Cheek with a two-by-four. *See Cupples v. State*, 318 Ark. 28, 883 S.W.2d 458 (1994). Third, this court has held that when the state violates the pretrial-discovery rule, the court has the following four options under Ark. R. Crim. P. 19.7: (1) The evidence may be excluded; (2) discovery or inspection may be ordered; (3) a continuance can be granted, and (4) an appropriate order may be entered depending upon the circumstances. *Reed v. State*, 312 Ark. 82, 847 S.W.2d 34 (1993). Johnson asked for none of the foregoing options, but the trial court offered a continuance which Johnson declined. Under the circumstances described above, we cannot say the trial court abused its discretion in rejecting Johnson's motion for mistrial.

Because we find no merit in Johnson's four points for reversal, we affirm.

NEWBERN and ROAF, JJ., dissent; BROWN, J., concurs; DUDLEY, J., not participating; Special Justice TOM B. SMITH joins this opinion.

ROBERT L. BROWN, Justice, concurring. I concur that the alleged violation of Rule 2.3 does not merit a reversal in this case but write because I have concluded that Johnson was in custody for all intents and purposes on May 2, 1994. This was the third time that he had been questioned by police officers in connection with Cheek's murder. On the first occasion [April 26, 1994], he was given the *Miranda* warnings. On the second occasion [May 1, 1994], he was not advised of his *Miranda* rights. On May 2, 1994, he was not advised of his rights until after he had made the inculpatory statement, "No, it was a two-by-four." After he made that statement, he was read his rights, and he gave a full statement, which included an admission that he had murdered Cheek. The issue then is whether Johnson was denied his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel.

My conclusion that Johnson was in custody is premised on several factors. He was interrogated on May 2 for four hours (from 9:00 a.m. to 1:00 p.m.) by multiple police officers. Sergeant Howard admitted that the investigation had centered on Johnson by May 2, and at trial he testified that there were never less than three police officers present during the interrogation and that there may have been as many as six or seven officers on occasion. Sergeant Howard's testimony also reveals that the grilling was intense and at times the officers called Johnson "a liar." His shoes were removed to conduct tests on what appeared to be blood splatters. Hence, he was barefoot. He was questioned about the blood spots and again called a liar when he denied knowledge of blood on his shoes.

Under these circumstances, Johnson's freedom was curtailed to a degree associated with formal arrest. *See Berkemer v. McCarty*, 468 U.S. 420 (1984); *State v. Spencer*, 319 Ark. 454, 892 S.W.2d 484 (1995). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of action in any significant way." *Spencer v. State*, 319 Ark. at 457, 892 S.W.2d at 485. The test is an objective one of how a reasonable person would view the situation. *Stansbury v. California*, 114 S.Ct. 1526 (1994). Johnson was barefoot and undergoing a prolonged and intense interrogation by several officers after

being called to the police station for a third time. This was clearly custodial interrogation in my judgment.

The question then becomes whether he was appropriately *Mirandized* before he made his two-by-four admission. I do not believe he was. His warnings given six days earlier had become stale. We did refuse to suppress a statement in *Barnes* v. *State*, 281 Ark. 489, 665 S.W.2d 263 (1984), where the lapse between *Miranda* warnings and the statement had been three or four days. But in *Barnes*, the lapse of time was not as great, and the defendant was under arrest from the beginning. Also, in *Barnes* the confession was not obtained through interrogation but rather as a compulsion on the defendant's part to repent and confess.

Irrespective of whether the two-by-four statement was given in accordance with *Miranda* requirements, Johnson then made a *complete* statement after being advised of his rights on May 2. Confessions voluntarily made after proper *Miranda* warnings and waivers are not tainted by previous unwarned statements unless those unwarned statements were deliberately coerced or improper tactics were utilized. *Oregon* v. *Elstad*, 470 U.S. 298 (1985); *Weaver* v. *State*, 305 Ark. 180, 806 S.W.2d 615 (1991). Though I believe the questioning leading up to the two-by-four statement was custodial interrogation, I am not convinced that it was so impermissibly coercive and improper as to taint the later, valid confession. For example, Sergeant Howard testified that the two-by-four statement "came almost out of the blue." Accordingly, I concur.

ANDREE LAYTON ROAF, Justice, dissenting. I do not agree that the police officers who interrogated Johnson complied with Ark. R. Crim. P. 2.3. As his incriminating statement was given while he was unlawfully seized, and before he was advised of his Miranda rights, I would reverse.

The majority opinion discusses the circumstances of Johnson's three interrogations on April 26, May 1, and May 2, 1994. I do not dispute the recitation of the facts. However, Johnson made his confession on May 2, not April 26 or May 1. A law enforcement officer requested on May 1 that Johnson come to the police station on May 2; this request triggers the application of Rule 2.3. There is no indication that any further statements were made to Johnson at the time of this request; therefore, the officer failed to comply with Rule 2.3. The majority correctly states that Officer Howard testi-

fied that he advised Johnson on May 2 that he was not under arrest and that he was "there of his own free will." However, we have held that advising a suspect that his cooperation is voluntary does not satisfy the positive duty to make it clear that there is no legal obligation to comply with the officer's request. *Prowell* v. *State*, 324 Ark. 335, 921 S.W.2d 585 (1996); *Addison* v. *State*, 298 Ark. 1, 763 S.W.2d 566 (1989).

The majority further states that Officer Reese testified that "Johnson was free to leave, but did not do so." This is also correct, but this testimony in no way informs us what Reese, or any other officer, told Johnson. The same can be said for the testimony of Officer Howard, who stated that Johnson knew where the restrooms, water fountains, and coffee pot were located, and was free to "come and go" as he pleased, presumably to get water, coffee and to use the restroom during his "interview" on May 2. This testimony again falls short of the standard for Rule 2.3 compliance.

I am most troubled by the majority's conclusion, without authority, that Rule 2.3 need only be complied with at the initial request, when there are repeated requests to come to the police station. This is perhaps a concession that the officers' testimony does not support a holding that the rule was complied with on May 1 or May 2. Although I agree that we are to consider the totality of the circumstances in determining whether Johnson's confession should be suppressed, to do so in this case entails consideration of the entire record, including the officers' testimony at trial. *Hignite* v. *State*, 265 Ark. 866, 581 S.W.2d 552 (1979). At trial, the officers testified that Johnson was interrogated at the police station on May 2 from approximately 9:00 a.m. to 1:00; he was unshod and was only told, for the purpose of Rule 2.3, that "you're here of your own free will."

I respectfully dissent.

NEWBERN, J., joins in this dissent.