Terry KENYON *v.* STATE of Arkansas

CA CR 96-1288                                        946 S.W.2d 705

Court of Appeals of Arkansas
Division II
Opinion delivered June 4, 1997

*Lawrence A. Wright, Jr.* and *Russ Hunt,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Sandy Moll,* Asst. Att'y Gen., for appellee.

TERRY CRABTREE, Judge. Appellant Terry Jay Kenyon appeals his conviction of two counts of negligent homicide for which he was sentenced to a term of imprisonment of twelve months and fined $2,000. Appellant raises three points on appeal. He first argues that the trial court should have suppressed the results of the blood–alcohol test obtained by the State because the private laboratory that performed the test and then stored the remainder of the blood sample removed the sample from refrigeration, causing it to be useless for further testing by appellant. Appellant then argues that the judgment should be reversed because the trial court allowed the introduction of graphic photographs of the victims. Finally, appellant argues that the trial court should have granted his motion for a mistrial because spectators attending the trial and sitting near the front of the courtroom were wearing buttons with the picture of one of the victims and coming and going often, thereby drawing attention to themselves. Finding no error, we affirm.

The tragic facts of this case are that appellant and his wife, Rhonda Kenyon, invited three couples to a small "get-together" on their houseboat on Greers Ferry Lake at Heber Springs, Arkansas, on the evening of July 3, 1995. The couples grilled, drank beer and margueritas, and watched fireworks. From the testimony, it appears that appellant acted as host throughout the evening, serving the guests and grilling. According to the testimony by the guests on appellant's houseboat, appellant did not appear to be intoxicated during the evening. Appellant's testimony was that he had between three and four beers during the course of the evening. He testified that he had no difficulty cleaning up the boat and loading everyone's cars at the end of the evening. He felt that he was in an acceptable condition to drive. After the guests left at approximately 11:30 p.m., appellant and his wife straightened and cleaned the houseboat before leaving. Everyone was returning to Searcy, Arkansas, by way of Highway 16. Appellant's wife reclined her seat and slept on the way home while appellant drove. Appellant, who was driving a Ford Explorer, testified that he did not remember anything from the time that he left the parking lot at the lake.

Meanwhile, Melissa Patrick was spending the evening with her parents; a friend's child; her boyfriend, victim Steven Seitz; and her one-month-old son, victim Cody Patrick. At the end of the evening, Melissa Patrick, Steven Seitz, and Cody started to return to Hickory Flat, Arkansas, by way of Highway 16. Melissa was driving her pickup truck, and Steven was following in a Ford Escort with Cody strapped in an infant carseat in the backseat. Melissa's testimony was that she was driving fifty-five miles an hour when appellant's car entered her lane, hitting her truck, and causing her to wreck. Melissa was able to climb from her truck through a window and saw that the Escort in which Steven and Cody were riding also had been hit. Steven Seitz and Cody Patrick were killed instantly in the wreck. After the accident, Melissa was taken to the hospital in the same ambulance as appellant, but she was hysterical and could not recall if he smelled of alcohol.

Passengers in a car that immediately came upon the wreck and stopped testified that appellant had passed them on a double yellow line at a high rate of speed a mile or less before the acci-

dent. One passenger testified that he smelled alcohol in appellant's Ford Explorer. Another testified that he smelled a strong odor of intoxicants, but did not know if it was alcohol, anti-freeze, or something else.

The state trooper who went to the scene testified that he smelled alcohol on appellant and listed that as a contributing factor in the accident report. Both paramedics who came to the scene smelled a strong odor of intoxicants coming from appellant. Appellant's nurse at Central Arkansas Hospital testified that she smelled the distinct odor of alcohol coming from appellant.

Corporal Lindsey Williams of the Arkansas State Police testified that he is certified to reconstruct accidents. He arrived at the scene several hours after the accident. From the skid marks, measurements, and photographs, he concluded that the accident occurred on a stretch of straight, flat highway. It was Williams's definite opinion that the impact occurred in the victims' lane of traffic. Williams testified that his conclusion was that appellant crossed the center line, hit Melissa Patrick, then continued across the center line and hit the Ford Escort in which Steven Seitz and Cody Patrick were riding. He saw no sign of braking by appellant before the initial impact.

At the hospital, appellant signed a statement of rights form for administration of a blood-alcohol test. Appellant agreed to take the test. On the rights form, he indicated that he did not wish to have his own blood, urine, or breath test. Appellant put the wrong date on this form. He also wrote "I was not driving." The result of the legal blood test was that appellant had a blood-alcohol level of .10. The hospital also performed tests. The result of the medical tests performed by the hospital was that appellant's blood-alcohol level was .120. Melissa Patrick had a blood-alcohol level of .00, as did Steven Seitz.

We first address appellant's argument that the trial court should have suppressed the blood-alcohol test result showing his blood-alcohol level to be .10 because his right to have his own test performed was destroyed when the laboratory that performed the test removed his blood sample from refrigeration. He asserts that when a defendant's right to run his own tests is violated, his rem-

edy is the exclusion of the State's evidence because to do otherwise deprives the defendant of due process. The trial court correctly denied appellant's motion to suppress the result of the blood-alcohol test.

The facts pertinent to this point are that following the accident, appellant signed the statement of rights form as to the blood-alcohol test. The form explained his rights with regard to the test and explained his right to have his own test performed if he agreed to take the test. He agreed to submit to the blood-alcohol test and checked the box by the "no" following the question as to whether he would like a blood, urine, or breath test. Appellant signed this form at 2:05 a.m. on July 4, 1995. Then, on November 16, 1995, appellant filed a motion requesting an order directing the laboratory that stored the blood to make a portion of the blood available for independent testing. At this time it was discovered that an employee of the laboratory, which was privately owned and operated, had removed the blood from refrigerated storage, and the blood was no longer in a suitable condition for testing for the blood-alcohol level.

Section 5-65-204 of the Arkansas Code Annotated provides in pertinent part:

> (e) The person tested may have a physician or a qualified technician, registered nurse, or other qualified person of his own choice administer a complete chemical test in addition to any test administered at the direction of a law enforcement officer.

> (1) The law enforcement officer shall advise the person of this right.

> (2) The refusal or failure of a law enforcement officer to advise such person of this right and to permit and assist the person to obtain such test shall preclude the admission of evidence relating to the test taken at the direction of a law enforcement officer.

Ark. Code Ann. § 5-65-204(e).(Repl. 1993).

Appellant relies on the above statute and the case of *California v. Trombetta*, 467 U.S. 479 (1984), in support of his argument. In

*Trombetta,* the issue before the United States Supreme Court was "whether the Due Process Clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers in order for the results of breath-analysis tests to be admissible in criminal prosecutions." *Id.* at 481. The Court held that "the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial." *Id.* at 491. In reaching its conclusion, the Court stated that the authorities in the case did not destroy the defendant's breath samples in a calculated effort to circumvent the disclosure requirements previously established by the Court; rather, the authorities acted in good faith. Secondly, the Court stated that, more importantly, the duty to preserve samples must be limited to evidence that "might be expected to play a significant role in the suspect's defense." *Id.* at 488. The Court stated that to meet this standard, the evidence must possess exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means. The Court noted that the evidence from the breath samples would be much more likely to be inculpatory rather than exculpatory. Finally, the Court pointed out that the defendants had other methods of demonstrating their innocence, such as presenting evidence of how the tests could be inaccurate.

In *Wenzel v. State,* 306 Ark. 527, 815 S.W.2d 938 (1991), the Arkansas Supreme Court followed *Trombetta, supra,* in affirming a defendant's conviction when he appealed on the basis that the State had used all the semen found on vaginal swabs during DNA testing, and he was, therefore, unable to conduct his own tests. The court stated that the defendant made no showing that the evidence possessed exculpatory value before it was destroyed. The court also cited *Arizona v. Youngblood,* 488 U.S. 51 (1988), in stating that the defendant failed to show bad faith on the part of the State, which was necessary in order to constitute a denial of due process.

Applying *Trombetta* and *Wenzel* to the present case, the trial court correctly admitted the evidence of the blood-alcohol test. First, the authorities did not destroy the leftover blood sample in

bad faith. To the contrary, the State did not destroy the sample at all; an employee of a private laboratory left the sample out of refrigeration after appellant had waived his right to have his own analysis performed. We do not agree that the private laboratory employee's inadvertent destruction of the blood sample was "tantamount to bad faith on the part of the State" as argued by appellant. As appellant's attorney admitted to the trial court, there is no evidence that the State or any other person requested, hinted, schemed, or in any way caused the lab employee to remove the blood from refrigeration. Second, all indications are that another test performed on the blood sample would have proven inculpatory rather than exculpatory. Not only had the State's test revealed a blood-alcohol level of .10, but the hospital's test, which was introduced by appellant, obtained a result of .12. Thus, the alleged exculpatory value of the test was not at all apparent before the sample was left out of refrigeration. Thirdly, appellant had other means to demonstrate his innocence, which he did, through the testimony of his expert, who attacked the accuracy of the particular test run on the State's sample.

In sum, appellant waived his right to have his own analysis performed; there was no evidence of bad faith; the exculpatory value of the sample was not apparent, in fact further tests probably would have proven inculpatory; and appellant put on evidence through his expert that the test results could be inaccurate. The trial court properly admitted the test result.

We now turn to appellant's argument that the judgment should be reversed because the trial court admitted inflammatory photographs of the victims. It is appellant's position that the probative value of the photographs was outweighed by the prejudicial value since there were other methods available for the State to prove the death of the victims.

We do not determine this argument on the merits because appellant failed to provide a copy of the photographs in issue in the abstract. Although appellant requests in his reply brief that this court waive the requirement that the photographs be included in the abstract, he cites no authority for doing this and presents no convincing argument that the court should do so in

this case. The law is well established that the appellate court will not consider the admissibility of photographs when the appealing party fails to include copies in the abstract.

In *Coney v. State*, 319 Ark. 709, 894 S.W.2d 583 (1995), the supreme court stated that when the admission of photographs is an issue on appeal, the failure to include them in the abstract is fatal to the point because the reviewing court cannot have a clear understanding of the objection that forms the basis of the appeal. The court reiterated the rule that there is only one record, and it is essential that the material parts of the record be abstracted.

In *Schalski v. State*, 322 Ark. 63, 907 S.W.2d 693 (1995), the supreme court did not consider an argument on appeal concerning photographs when black-and-white photocopies of the photographs were in the abstract. The court stated that the State described the photographs, but the appellant's abstract contained only black-and-white photocopies, and the court could not tell what the photos depicted and whether they were without probative value. The court stated that, therefore, it could not state that the trial court abused its discretion in admitting the photographs.

The record on appeal is limited to that which is abstracted. *Moncrief v. State*, 325 Ark. 173, 925 S.W.2d 776 (1996). Without the photographs in issue to consider, this court cannot say that the trial court abused its discretion in admitting them into evidence.

Even if we were to decide this issue on the merits, we would affirm. The trial court specifically stated that it would rule on each photograph individually. The State wished to introduce eight photographs taken by the state police and seventeen photographs taken by the coroner's office. The trial court found that, while the State had the right to prove the cause of death through the method and manner it wished, the number of photographs was excessive. The trial court refused to allow the introduction of duplicative photographs, finding that allowing such duplication would inflame and prejudice the jury. The court allowed the introduction of three of the photographs.

The first photograph depicts victim Cody Patrick. It shows the cause of death and that Cody was strapped in a carseat. The second photograph shows both victims in the car. From the second photograph, one can see the damage to the car and the injury to the victims. The third photograph shows victim Steven Seitz, still strapped in the driver's seat, and also shows the damage to the car. The second and third photograph demonstrate the speed at which the collision occurred and the impact of the cars. *See Prunty v. State*, 271 Ark. 77, 607 S.W.2d 374 (1980).

Whether to admit photographs into evidence is a matter left to the sound discretion of the trial judge, and his determination will not be reversed absent a clear abuse of that discretion. *Morris v. State*, 302 Ark. 532, 792 S.W.2d 288 (1990). Photographs may be admissible even if they are cumulative to other evidence presented. *Id.* Even inflammatory photographs are admissible if they shed light on an issue, help a witness to better describe what is portrayed, or enable the jury to understand the testimony. *Id.* Rather than routinely accepting, carte blanche, graphic and repetitive photographs, the trial court should weigh the probative value of photographs against their prejudicial nature. *Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986).

In the present case, the trial court did not give carte blanche acceptance to the photographs. Rather, the court considered the photographs and excluded all but three. The witness testifying as to the three photographs in issue stated that the photographs would help him to describe the victims' injuries and how they died. He testified that the photographs helped show the severity of the collision. The witness testified that the photographs would much better depict the nature of the victims' deaths than he could describe. The trial court did not abuse its discretion in admitting the photographs.

As his third point for reversal, appellant argues that the judgment should be reversed because the trial court denied his motion for a mistrial. His motion was based on the fact that spectators who were sitting near the front of the courtroom were wearing badges with the photograph of one of the victims on them. According to appellant's attorney's statement to the trial court,

these people were coming and going often. It is appellant's position that these individuals prejudiced the jury.

After the selection of eight jurors and during the noon recess before finishing voir dire, appellant's attorney addressed the trial court, stating that it was brought to his attention during the middle of his voir dire that there were people in the front row of the audience who were wearing badges with a picture of one of the victims on them. From the discussion of the lawyers and the judge, it appears that the badges were approximately four inches in diameter, but contained writing as well as the photograph, so that the photograph was about the size of a driver's license picture. Appellant's attorney asserted that the people with the badges had continually walked back and forth in the courtroom and periodically left and come back, thus drawing attention to themselves and their grief. Appellant's attorney stated that this was very prejudicial and requested a mistrial. The trial court denied the motion for mistrial, stating that appellant had had no objection to the trial court deferring action until the first break. The trial court noted that the prosecutor had advised the people during lunch to take the badges off. The trial court also noted that it had seen only two people get up and leave from the front row. The court did not think that the jury had been prejudiced, but stated that appellant's attorney could inquire of the panel to determine if they had been. The abstract does not contain any questioning of the jury panel by appellant's attorney as to this matter.

■■ The granting of a mistrial is a drastic remedy. *Johnson v. State*, 325 Ark. 197, 926 S.W.2d 837 (1996). A trial court should only resort to mistrial when there "has been an error so prejudicial that justice cannot be served by continuing the trial." *Id.* at 204, 926 S.W.2d at 837. The determination of whether to grant a motion for mistrial is a matter within the trial court's sound discretion, and a denial of a motion for mistrial will not be reversed absent an abuse of that discretion. *Johnson, supra.* In the present case, it has not been demonstrated that the jury saw the badges being worn by some spectators or, if they did, that this affected their ability to be fair jurors. Also, it is not clear that the jury members, if they saw that some people were wearing badges, could tell what was on them. Appellant did not question the

panel with regard to whether they saw the buttons and could tell what they were and whether this would influence their ability to sit fairly on the jury. Appellant has not demonstrated prejudice, as is necessary in order for this court to reverse, *Berna v. State*, 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied* 470 U.S. 1985 (1985), and has failed to demonstrate that the trial court abused its discretion in denying his motion for mistrial.

Affirmed.

ROGERS and STROUD, JJ., agree.