John Wesley SHAVER *v.* STATE of Arkansas

CR 97-520                                    963 S.W.2d 598

Supreme Court of Arkansas
Opinion delivered February 25, 1998

*Paul Petty*, for appellant.

*Winston Bryant*, Att'y Gen., by: *David R. Raupp*, Sr. Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant John Wesley Shaver brings this appeal after entering a conditional plea of guilty of possession of methamphetamine with intent to deliver and receiving a sentence of 120 months in the department of correction. His sole point for reversal is that the trial court erred in failing to grant his motion to suppress evidence recovered as a result of an unlawful search and seizure. We affirm the trial court's ruling.

Shaver's arrest ensued from incidents that occurred at 2:40 a.m. on July 7, 1996. Greg Henry was driving Shaver's truck 76 miles per hour in a 55-mile-per-hour zone when Officers Larry Mitchell and Phillip Hydron stopped Henry for speeding. Shaver was a passenger in his truck. After Henry exited the vehicle and gave his driver's license to Officer Mitchell, Mitchell saw what appeared to be leather straps next to the passenger seat, and noticed that Shaver was seated with an old tee shirt or towel over his lap. Mitchell asked Henry if there were any weapons in the vehicle, and Henry responded, saying Shaver had two. Mitchell then alerted Officer Hydron of the presence of the guns and asked him to remove Shaver from the truck. Hydron obliged, had Shaver place his hands on the truck, and began to pat him down. As Hydron reached to pat Shaver down, he noticed a bulge in Shaver's front pocket. At the same time, Shaver "bowed up," causing Hydron to press him against the truck and to tell Shaver to calm down and keep his hands on the truck. Officer Hydron then decided to reach inside Shaver's pocket to determine what caused the bulge. Hydron pulled out a bag of white powdery substance, and he told Officer Mitchell that "it looks like we have discovered contraband." Hydron continued to pull out a substance from both of Shaver's pockets that he suspected was methamphetamine. Hydron testified that, initially, he had no idea what was in Shaver's pockets, but only knew there was a "big bulge." Hydron said that the bulge did not feel like a weapon, but added he was uncertain

what the contents were. On cross examination, Hydron related that his intent was to pull everything out of Shaver's pockets, regardless.

█ Recently, the Supreme Court held that an officer making a traffic stop may order passengers to get out of the vehicle pending completion of the stop. *Maryland v. Watson*, 117 S.Ct. 882 (February 19, 1997); *see also Wright v. State*, 327 Ark. 558, 940 S.W.2d 432 (1997). We have also held that, after a lawful stop, the police are permitted to search the outer clothing of an individual and the immediate vicinity for weapons if the facts available to an officer would warrant a person of reasonable caution to believe that a limited search was appropriate. *State v. Barter*, 310 Ark. 94, 833 S.W.2d 372 (1992); *Stout v. State*, 304 Ark. 610, 804 S.W.2d 686 (1991); A.R.Cr.P. Rule 3.4. Stated in slightly different terms, when an officer is justified in believing that an individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers or others, a patdown search may be conducted to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. *Terry v. Ohio*, 395 U.S. 1 (1968).

In seeking suppression of the drugs found on Shaver, Shaver relies heavily on *Minnesota v. Dickerson*, 508 U.S. 366 (1993), for his argument that Hydron's patdown of him exceeded the lawful bounds of *Terry*. In *Dickerson*, an officer responded to complaints of drug sales taking place at an apartment building, and when the officer arrived, he saw the defendant outside the building. The defendant attempted to evade the officer, and because the defendant had just left an apartment building known for cocaine traffic, the officer stopped and conducted a patdown of him. The officer felt a small lump in the front pocket, and as he examined it with his fingers, it slid and was felt to be a lump of crack cocaine in cellophane. The officer then pulled a plastic bag containing crack cocaine from the defendant's pocket and arrested him. Defendant Dickerson moved to suppress, but the trial court denied his motion. The Minnesota Court of Appeals reversed, and the Supreme Court ultimately reviewed Dickerson's case to consider the question concerning whether police officers may seize non-

threatening contraband detected during a protective patdown search of the sort permitted by *Terry*. The Court determined that officers may do so, so long as their search stays within the bounds of *Terry*.

In its review of Dickerson's case, the Supreme Court held that the officer overstepped his bounds because the officer's continued exploration of Dickerson's pocket, after having concluded that it contained no weapon, was unrelated to the sole justification of the search under *Terry* — the protection of the police officers and others nearby.

■ The *Dickerson* holding is simply not controlling here. We first point out that, in reviewing a trial judge's ruling on a motion to suppress, this court reviews the evidence most favorable to the appellee. *Johnson v. State*, 325 Ark. 197, 926 S.W.2d 837 (1996). This court reviews a trial court's suppression ruling under the totality of the circumstances, deferring to the superior position of that court to evaluate questions of credibility, and reverse only if the ruling is clearly against a preponderance of the evidence. *See Beshears v. State*, 320 Ark. 573, 898 S.W.2d 49 (1995); *State v. Osborn*, 263 Ark. 554, 566 S.W.2d 139 (1978); *Grant v. State*, 267 Ark. 50, 589 S.W.2d 11 (1979).

In the instant case, the trial court found Officers Mitchell and Hydron credible when describing their traffic stop of Shaver's truck and subsequent patdown of Shaver, and concluded the actions taken were reasonable to insure their safety. The officers became immediately aware that Shaver had two weapons inside the stopped vehicle, and Officer Mitchell had seen a leather holster next to where Shaver was seated. Mitchell also saw Shaver had a tee shirt or towel in his lap. After Shaver was directed to get out of the truck, and when Officer Hydron commenced a patdown, Shaver "bowed up," causing Hydron to tell him to "calm down" and again place his hands on the truck. Because of these actions and events, the trial court found it was reasonable for Hydron to reach into Shaver's pockets to determine what was causing the bulges. The trial court further concluded that, although Hydron felt a plastic bag with a rock-like substance in it, the officer still was unaware of what else was in Shaver's pocket

because he could not feel the entire contents of his pocket. The trial court ruled this uncertainty of Hydron as to what else was in Shaver's pocket was sufficient reason with all other circumstances for Hydron to search Shaver's pocket.

In his argument, Shaver places emphasis on Hydron's testimony that, when he searched Shaver's pocket, the bulge "did not feel like a weapon" and that his "intent was to pull everything out of Mr. Shaver's pockets, regardless." In doing so, however, he ignores the circumstances leading to the patdown of Shaver — that guns were present, Shaver was seen next to a leather holster with a tee shirt or towel in his lap, and Shaver appeared "a bit agitated" and was ordered to "calm down." To insure the officers' safety, Officer Hydron felt compelled to check the "big bulge" in Shaver's pocket, and while, in doing so, he found a bag of white powdery substance, Hydron remained uncertain regarding what else was in Shaver's pockets. Under these described circumstances, we cannot say the trial court was clearly wrong in finding Officer Hydron was justified in conducting a limited search to determine that Shaver had no weapon on his person.

NEWBERN and IMBER, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. When Officer Hydron reached into the front pocket of appellant John Wesley Shaver's blue jeans and seized its contents, he violated Mr. Shaver's right under the Fourth Amendment to be free from unreasonable searches and seizures. We should reverse the conviction and direct the Trial Court to suppress the items seized by Officer Hydron.

The majority opinion erroneously asserts that Officer Hydron's actions may be condoned under the rule announced by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). In the *Terry* case, the Supreme Court held that a police officer may stop and detain an individual, even in the absence of probable cause to arrest, if the officer has a "reasonable suspicion," based upon "specific and articulable facts," that the individual is involved in criminal activity. The *Terry* case further held that, if the officer also reasonably suspects that the person he has detained is "armed and presently dangerous," the officer is "entitled for the protection of himself and others in the area to conduct a carefully

limited search of the outer clothing" of the individual "in an attempt to discover weapons which might be used to assault him." *Id.* at 30. If, during the exterior "weapons frisk," the officer detects an item that he reasonably believes is a weapon, he may, according to the *Terry* case, seize the item.

A *Terry* weapons frisk is not "justified by any need to prevent the disappearance or destruction of evidence of crime." *Id.* at 29. Rather, its "sole justification . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id. See Adams v. Williams,* 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . .").

Thus, even if an officer is reasonable in *commencing* a *Terry* weapons frisk, the scope of the search that follows "must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio,* 392 U.S. at 19. "A search for weapons in the absence of probable cause to arrest . . . must . . . be strictly circumscribed by the exigencies which justify its initiation. Thus it must be limited to that which is *necessary* for the discovery of weapons which might be used to harm the officer or others nearby . . . ." *Id.* at 26 (emphasis added). "[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." *Id.* at 29. *See Minnesota v. Dickerson,* 508 U.S. 366, 373 (1993)("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."), *citing Sibron v. New York,* 392 U.S. 40, 65-66 (1968).

We have followed the *Terry* case in several of our own decisions. *See, e.g., State v. Barter,* 310 Ark. 94, 833 S.W.2d 372 (1992); *Stout v. State,* 304 Ark. 610, 614, 804 S.W.2d 686 (1991); *Wright v. State,* 300 Ark. 259, 778 S.W.2d 944 (1989); *Cooper v. State,* 297 Ark. 478, 763 S.W.2d 645 (1989); *Hill v. State,* 275

Ark. 71, 628 S.W.2d 285 (1982); *Webb v. State*, 269 Ark. 415, 601 S.W.2d 848 (1980).

Our rules of criminal procedure have codified the principles discussed in the *Terry* case. Under Ark. R. Crim. P. 3.1, an officer may stop and detain a person upon reasonable suspicion that the person "is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property." "'Reasonable suspicion' means a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R. Crim. P. 2.1. If an officer has detained an individual pursuant to Rule 3.1, he then may proceed under Rule 3.4, which provides as follows:

> If a law enforcement officer who has detained a person under Rule 3.1 reasonably suspects that the person is armed and presently dangerous to the officer or others, the officer or someone designated by him may search the outer clothing of such person and the immediate surroundings for, and seize, any weapon or other dangerous thing which may be used against the officer or others. In no event shall this search be more extensive than is reasonably necessary to ensure the safety of the officer or others.

Thus, the *Terry* case and our rules of criminal procedure allow an officer to commence a weapons frisk when the officer (1) has detained the suspect based on reasonable suspicion that he is involved in criminal activity, and (2) reasonably believes the suspect is armed and dangerous. However, a weapons frisk also may be permissible where the reason for the initial detention is *not* that the suspect is involved in criminal activity. Under *Pennsylvania v. Mimms*, 434 U.S. 106 (1997), and *Maryland v. Wilson*, 117 S. Ct. 882 (1997), a driver or passenger, even one who is not suspected of any criminal activity, may be ordered from a vehicle following a valid traffic stop and thus "detained" for Fourth Amendment purposes. If the officer then develops reason to believe the driver or passenger is armed and dangerous, he may conduct a *Terry* weapons frisk.

Under the rule announced in *Minnesota v. Dickerson*, 508 U.S. 266 (1993), an officer may seize even contraband if its incriminating nature becomes immediately apparent to him "through the sense of touch during an otherwise lawful" *Terry* search. In approving this "plain-feel" exception to the Fourth Amendment's warrant requirement, the Court in *Dickerson* observed that, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id.* at 376-77.

In light of the above principles and the factual circumstances recited in the majority opinion, I am willing to concede, for the sake of argument, that Officer Hydron was reasonable in detaining Mr. Shaver and in further concluding that Mr. Shaver was armed and dangerous. Thus, I do not dispute the majority's suggestion that Officer Hydron was permitted by the *Terry* case to commence a weapons frisk of Mr. Shaver's outer clothing.

The facts mentioned by the majority, however, only justify the *commencement* of a *Terry* search, not Officer Hydron's subsequent intrusion into Mr. Shaver's pocket. Based on Officer Hydron's own testimony, it is clear that he exceeded the scope of the search that he was permitted by the *Terry* case to undertake when he reached into Mr. Shaver's pocket. Officer Hydron testified that, when he "reached to pat Mr. Shaver down," he noticed a bulge in Mr. Shaver's front pocket. Officer Hydron testified that he "was uncertain as to what it was." Significantly, he testified that the item "*did not feel like a weapon.*" The officer said that he "didn't know or have any idea what was in his pockets. All I knew was that there was a big bulge, so that is why I decided to reach inside the pocket." He emphasized that he would have emptied Mr. Shaver's pockets "regardless."

By his own admission, Officer Hydron intruded into Mr. Shaver's inner clothing without first concluding that the item he had detected in the course of the pat-down was a weapon. That

fact renders the officer's entry into the pocket illegal under the Fourth Amendment. In approving the officer's conduct in the *Terry* case, the Court was careful to note that the officer "did not place his hands" in the suspects' "pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns." *Terry v. Ohio,* 392 U.S. at 30.

In *Sibron v. New York, supra,* which was a companion case to the *Terry* case, the Court invalidated the officer's search of the petitioner's pocket because that extension of the initial, exterior pat-down was not based on a reasonable suspicion that a weapon would be found there. The Court in *Sibron* distinguished the *Terry* case as follows:

> The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. *Only when he discovered such objects* did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration of arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. *The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man.*

*New York v. Sibron,* 392 U.S. at 65 (emphasis added). *See also Bailey v. State,* 246 Ark. 362, 367, 438 S.W.2d 321, 324-25 (1969) (reversing appellant's conviction and stating officer's search of appellant's pocket and seizure of pocketbook was invalid and had "no reasonable relation to the object of the search, that being for a weapon"; *Leopold v. State,* 15 Ark. App. 292, 297, 692 S.W.2d 780, 784 (1985) ("An officer has the right to frisk a detainee's possessions under *Terry* if there is a reasonable suspicion that there is a weapon located there.").

The decisions of courts in other jurisdictions also require that an officer conducting a *Terry* search must, before moving the search from the exterior to the interior of a suspect's clothing, have a reason to believe that the item he has detected is a weapon.

In *People v. Collins*, 463 P.2d 403, 406 (Cal. 1970), the Supreme Court of California held that the scope of an exterior pat-down "cannot be exceeded at the mere discretion of an officer, but only upon discovery of tactile evidence particularly tending to corroborate suspicion that the suspect is armed." The court observed that "[f]eeling a soft object in a suspect's pocket during a pat-down, absent unusual circumstances, does not warrant an officer's intrusion into a suspect's pocket to retrieve the object." *Id.*

Numerous other cases are in accord. *See, e.g., Ellis v. State,* 573 So. 2d 724, 725 (Miss. 1990)("When an object is soft or does not reasonably resemble a weapon, the *Terry* analysis does not justify removing it from the suspect's clothing and searching it."); *United States v. Santillanes,* 848 F.2d 1103 (10th Cir. 1988); *State v. Collins,* 679 P.2d 80 (Ariz.App. 1984); *Blackburn v. State,* 414 So.2d 651, 652 (Fla.App. 2d Dist. 1982)(seizure of item that caused a "bulge" in appellant's shirt pocket held "not permissible when the officer does not reasonably believe that what he is finding is a weapon"); *Francis v. State,* 584 P.2d 1359, 1363 (Okl.Cr. 1978)("When in course of a frisk the officer feels an object, he is not justified in seizing it unless it reasonably resembles an offensive weapon."); *People v. McCarty,* 296 N.E.2d 862 (Ill.App. 1973) . *See generally* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(c), at pp. 276-80 (3d ed. 1996).

Thus, even if Officer Hydron could have legitimately commenced a *Terry* search of Mr. Shaver's outer clothing, the officer's testimony shows that he never concluded, as a result of his initial pat-down, that the "bulge" he detected in Mr. Shaver's pocket was a weapon. It follows that the officer's entry into Mr. Shaver's pocket was "not reasonably related to the circumstances which provoked the protective search for weapons." *United States v. Del Toro,* 464 F.2d 520, 522-23 (2d Cir. 1972). The search, therefore, did not comply with the *Terry* case, and the evidence seized as a result of the search should be suppressed. Nor can Officer Hydron's intrusion into Mr. Shaver's pocket be justified under the "plain-feel" exception approved by the Supreme Court in *Minne-*

*sota v. Dickerson, supra.* Nothing in the officer's testimony suggests that the "incriminating nature" of the bulge became "immediately apparent" to the officer during his pat-down of Mr. Shaver's outer clothing. The officer testified he "had no idea" what was there.

In the darkness of 2:40 a.m. on a July morning in the presence of two men whose vehicle containing weapons has been stopped for speeding, police officers are undoubtedly entitled to take reasonable measures to protect themselves from the possibility of being wounded if one of the men, removed from the vehicle, has a weapon in his pocket. The law must zealously provide for the officers' protection. At least equal zeal must, however, be applied to the protection of this principle: "The right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures shall not be violated . . . ." U.S. Const., amend. 4. Obviously, a balance must be achieved by interpreting the word "unreasonable," and then a line must be drawn.

To avoid the Fourth Amendment being swallowed by the need to protect the officers, and to avoid the need to protect the officers from being swallowed by the Fourth Amendment, the United States Supreme Court has drawn the line, described in the cases cited above, to be followed by all courts, including this one. In this instance this Court has clearly overstepped that boundary.

I respectfully dissent.

IMBER, J., joins in this dissent.