Ricky KEARSE a/k/a Ricky Taylor *v.*.
STATE of Arkansas

CA CR 98-615                                  986 S.W.2d 423

Court of Appeals of Arkansas
Division IV
Opinion delivered February 24, 1999

*Christopher Carter*, Marion County Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *C. Joseph Cordi, Jr.*, Ass't Att'y Gen., for appellee.

JOHN E. JENNINGS, Judge. The appellant, Ricky Kearse, was found guilty by a Marion County jury of possession of methamphetamine, possession of marijuana, simultaneous possession of drugs and weapons, and possession of drug paraphernalia. He was sentenced to concurrent terms of 120 months, or ten years in prison. As his only issue on appeal, appellant contends that the trial court erred in denying his motion to suppress. We affirm.

The items of contraband that formed the basis for appellant's convictions were discovered in a search conducted by State Trooper Scott Roberts after a stop of appellant's vehicle. At the suppression hearing, Officer Roberts testified that he responded to a call received at the Marion County Sheriff's Department and that Officer Bob Chapman, a Bull Shoals policeman, rode along with him. On Highway 62, just outside of Yellville, they met a vehicle traveling in excess of the speed limit at 71 miles an hour, according to radar. Roberts turned around and gave chase. After negotiating curves and hills for about three-quarters of a mile, he saw the target vehicle turn onto a gravel road, still at a high rate of speed. The vehicle came to a stop upon encountering a locked gate.

Officer Roberts had appellant get out of the vehicle. He testified that, at least initially, it was his intention to conduct a pat-down search of appellant's person for reasons of his own safety. He based this on his observation of appellant leaning over toward the passenger side of the vehicle, his detection of the odor of alcohol, his impression that appellant had tried to evade the stop, the

fact that the stop took place in an out-of-the-way area, and his observation of live ammunition lying loosely on the driver-side floorboard of appellant's vehicle. Roberts testified, however, that he placed appellant under arrest for speeding, after appellant made an uncooperative statement. Roberts patted appellant's left front pocket and felt what he believed to be a magazine clip of a pistol. While asking where the weapon was, he retrieved the gun clip and felt something else. It was a bag of marijuana. When Roberts mentioned a weapon, Officer Chapman came over to offer assistance. Chapman retrieved from appellant's right front pocket a .380 caliber, semi-automatic pistol that was chambered and fully loaded. A bag of crystal methamphetamine was found in appellant's watch pocket.

In his argument for reversal, appellant does not question the validity of the stop. He also concedes that he was speeding. He argues that the search cannot be supported as either a *Terry* search or as one incident to arrest.

In reviewing the denial of a motion to suppress, we make an independent examination based on the totality of the circumstances and reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Frette v. City of Springdale*, 331 Ark. 103, 959 S.W.2d 734 (1998).

When an officer is justified in believing that an individual he is investigating at close range is armed and dangerous, a pat-down search may be conducted to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. *Terry v. Ohio*, 392 U.S. 1 (1968); *Shaver v. State*, 332 Ark. 13, 963 S.W.2d 598 (1998). In *Terry*, the Court said:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.

*Terry v. Ohio*, 392 U.S. at 23. The considerations announced in *Terry* are codified in Rule 3.4 of the Arkansas Rules of Criminal Procedure, which states:

> If a law enforcement officer who has detained a person under Rule 3.1 reasonably suspects that the person is armed and presently dangerous to the officer or others, the officer or someone designated by him may search the outer clothing of such person and the immediate surroundings for, and seize, any weapon or other dangerous thing which may be used against the officer or others. In no event shall this search be more extensive than is reasonably necessary to ensure the safety of the officer or others.

The issue in these cases is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Saul v. State*, 33 Ark. App. 160, 803 S.W.2d 941 (1991).

■ Appellant's argument is that Officer Roberts's testimony is not deserving of belief and that there is thus no reason to consider the situation as one posing a danger to the officers. But we defer to the trial court's finding of fact when the only determination is the credibility of a witness. *Stephens v. State*, 328 Ark. 81, 941 S.W.2d 411 (1997). Officer Roberts's testimony was deemed credible by the trial court, and we cannot say that appellant's argument warrants a finding that the denial of the motion to suppress was clearly erroneous.

■ ■ Appellant's argument that the search cannot be justified as one incident to an arrest is based on the contention that an arrest for a minor traffic violation or a "non-jailable" offense is contrary to the spirit of the Fourth Amendment. He recognizes that Arkansas law is not supportive of that position by referring us to the decisions in *State v. Earl*,[1] 333 Ark. 489, 970 S.W.2d 789 (1998), and *Wright v. State*, 300 Ark. 259, 778 S.W.2d 944 (1989). In *Earl,* the supreme court ruled that a motorist could be arrested for running a stop sign, while in *Wright* the court noted that one could be arrested for speeding. The authority for these holdings is

---

[1] *State v. Earl, infra,* has been effectively overruled by the Supreme Court in its decision of *Knowles v. Iowa*, 119 S.Ct. 484 (1998), but only insofar as the *Earl* decision relates to Ark. R. Crim. P. 5.5.

Rule 4.1(a)(iii) of the Arkansas Rules of Criminal Procedure, which provides that a law enforcement officer may arrest a person without a warrant if the officer has reasonable cause to believe that the person has committed *any* violation of the law in the officer's presence. Appellant urges us, however, to overrule these supreme court decisions. We lack the authority to do so. *Roark v. State*, 46 Ark. App. 49, 876 S.W.2d 596 (1994). Moreover, appellant has cited no authority for his argument that Rule 4.1 is constitutionally infirm. That is sufficient reason to affirm the trial court's ruling. *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997).

■ Appellant has conceded that he was speeding, and the officer in this instance made an actual arrest of appellant for committing that offense. A search incident to a lawful arrest is a traditional exception to the warrant requirement. *United States v. Robinson*, 414 U.S. 218 (1973). The trial court's finding that the search was proper as incident to a lawful arrest is not clearly erroneous.

We conclude that the judge's denial of the motion to suppress is supported on both the stated grounds.

Affirmed.

STROUD, J., agrees.

GRIFFEN, J., concurs.

WENDELL L. GRIFFEN, Judge, concurring. I agree that the trial court reached the right result when it denied appellant's motion to suppress a gun clip found in his left front pocket, a firearm found in his right front pocket, and what the police believed was marijuana and methamphetamine in a pat-down search of his person. I also agree that the trial court correctly denied appellant's motion to suppress various items of drug paraphernalia found in his vehicle after he was arrested for speeding, and that Trooper Roberts had specific and articulable reasons for suspecting that appellant may have posed a threat based upon appellant's actions after he stopped his vehicle. Since the decision in *Terry v. Ohio*, 392 U.S. 1 (1968), it has been clear that the police have a limited right to conduct pat-down searches of detained persons when they have specific and articulable reasons

for suspecting that the detainees pose threats to their safety or to the safety of others. In this case, Trooper Roberts testified that appellant made a movement toward the passenger seat after he stopped his vehicle. Roberts testified that he saw live ammunition on the floor of appellant's vehicle when he (Roberts) approached the driver's side to speak with appellant about the reason he was stopped. A law enforcement officer with a reasonable sense of personal safety certainly would have been concerned by these facts. The fact that Roberts had stopped appellant for speeding did not lessen the threatening nature of these facts.

However, I write separately to address appellant's contention that his arrest for speeding was merely a pretext for race discrimination against him because he is black. Appellant argues that the traffic stop for speeding in this instance was a pretext to stop him and conduct a search of his person and vehicle for possible drug offenses, and he has emphasized that the supreme court decisions in *State v. Earl*, 333 Ark. 489, 970 S.W.2d 789 (1998), *Wright v. State*, 300 Ark. 259, 778 S.W.2d 944 (1989), and *Perez v. State*, 260 Ark. 438, 541 S.W.2d 915 (1976), demonstrate that this allegedly pretextual conduct targets black and Hispanic drivers. While I join the majority in affirming appellant's conviction and rejecting his contention, I write separately to address the issue of alleged race discrimination in the context of traffic stops and searches that allegedly violate the Fourth Amendment.

The Fourteenth Amendment to the Constitution of the United States guarantees that no person shall be deprived of equal protection of the laws on account of race. This should mean, at minimum, that African-American and Hispanic drivers should not be held to a more stringent standard concerning traffic offenses than are white drivers. But even before the United States Supreme Court decided *Whren v. United States*, 517 U.S. 806 (1996), and upheld the use of traffic violations as a pretext for stopping a car and investigating possible drug offenses despite lacking probable cause or reasonable suspicion to stop the driver for narcotics crimes, it has been clear that police will not subject *all* drivers to traffic stops as *Whren* allows. Professor David A. Harris of the University of Toledo College of Law has commented on this situation in a law review article. *See* David A. Harris, *"Driving*

*While Black" and All Other Traffic Offenses: the Supreme Court and Pretextual Traffic Stops*, 87 J. CRIM. L. & CRIMINOLOGY 544 (1997).

> Police will *not* subject all drivers to traffic stops in the way *Whren* allows. Rather, if past practice is any indication, they will use the traffic code to stop a hugely disproportionate number of African-Americans and Hispanics. We know this because *it is exactly what has been happening already*, even before receiving the Supreme Court's imprimatur in *Whren*. In fact, the stopping of black drivers, just to see what officers can find, has become so common in some places that this practice has its own name: African-Americans sometimes say they have been stopped for the offense of "driving while black."

*Id.* 87 J. CRIM. L. & CRIMINOLOGY 546 (emphasis in original text). Before examining four examples of what he termed "pretextual stops," Professor Harris wrote:

> [W]hile *Whren* certainly makes it *possible* for the police to stop anyone, the fact is that police *will not* stop *just anyone*. In fact, police will use the immense discretionary power *Whren* gives them mostly to stop African-Americans and Hispanics. I say this not to imply that individual officers will act out of racist motivations. Though some will, I believe most will not. Rather, my point is that whatever their motivation, viewed as a whole, pretextual stops will be used against African-Americans and Hispanics in percentages wildly out of proportion to their numbers in the driving population.

> It may seem bold that I make this assertion as a fact. In fact, I lack the kind of systematically gathered and analyzed data anyone making such a statement would prefer to have. This is because virtually no one—no individual, no police department, and no other government agency—has ever kept comprehensive statistics on who[m] police stop: basis for the stop, race of suspect, type of police activity after stop (e.g., questioning, search of suspect, search of car, use of drug-sniffing dog, whether consent was given), and the like. Of course, one type of record does follow some percentage of stops: traffic tickets and warnings, and arrest, charging and prosecution records of those suspects police find with contraband. But looking only at the records of those

charged and prosecuted can mislead, and says nothing about the many other stops that result in no ticket and yield no contraband.

Even so, information uncovered in the last few years has begun to shed light on the use of pretextual traffic stops. That data reveal several patterns, which African-Americans and Hispanics understand quite well already: police use traffic regulations to investigate many innocent citizens; these investigations, which are often quite intrusive, concern drugs, not traffic; and African-Americans and Hispanics are the targets of choice for law enforcement. So even if we lack systemic data, we now have something that gives us a strong indication of current law enforcement realities and the direction of future trends. We can comfortably predict the effect of *Whren*: police will use the case to justify and expand drug interdiction efforts against people of color.

*Id.* 87 J. CRIM. L. & CRIMINOLOGY 560.

Professor Harris has reached a conclusion that has long been known and lived by countless African-American and Hispanic drivers. Despite denials of race discrimination by police agencies and other public officials when traffic arrest statistics such as those analyzed by Professor Harris in his article are mentioned, African-American and Hispanic drivers have long realized that they run a greater risk of being stopped for routine traffic offenses than the rest of the driving public, and that they run a higher risk of having their vehicles searched following those traffic stops. Professor Harris reported that although African-American and Hispanics make up only about five percent of the drivers on the Volusia County, Florida stretch of Interstate 95 in central Florida, when the *Orlando Sentinel* newspaper obtained 148 hours of videotape involving almost 1,100 traffic stops using Florida's public records law, it found that more than seventy percent of all drivers stopped were either African-American or Hispanic. One African-American man reported being stopped seven times by police while another reported being stopped twice within minutes. The videotapes not only showed that the police stopped black and Hispanic drivers more often than whites; they stopped them for longer periods of time. Eighty percent of the cars searched belonged to African-American or Hispanic drivers. While the police empha-

sized that they made the 1,100 stops based on "legitimate traffic violations" ranging from "swerving," to exceeding the speed limit by up to ten miles per hour, burned-out license-tag lights, improper license tags, failure to signal before changing lanes, and other violations, *only nine of the nearly 1,100 drivers stopped received tickets. However, the videotapes showed that the sheriff deputies seized cash almost three times as often as they arrested anyone for drugs, and that ninety percent of the drivers from whom cash was taken, but who were not arrested, were black or Hispanic.*

I hasten to mention that two federal civil rights lawsuits were dismissed after the plaintiffs alleged that they were targeted for stops based on their race arising from the Volusia County, Florida situation. *See Washington v. Vogel*, 106 F.2d 415 (11th Cir. 1997), *aff'd.* 880 F.Supp. 1542 (M.D. Fla. 1995). While the dismissals have legal significance, the fact that the lawsuits were dismissed does not alter what the Eleventh Circuit Court of Appeals termed the "highly disturbing" nature of the evidence.

As Professor Harris demonstrates by this and three other examples in his article, this is precisely the type of police activity that African-Americans and Hispanics have complained about for years. Few people have listened. After the Maryland State Police stopped a rental car carrying four African-Americans on Interstate 68 during the early morning hours of May 8, 1992, for speeding, the officer asked the driver to sign a form giving consent to a search. When one of the passengers identified himself as an attorney and challenged the design to search the car without arresting the driver, the group was detained for another half hour while other officers brought a drug-sniffing dog to the scene. When the dog arrived, the police ordered the lawyer and his three relatives (who were returning from a funeral in Chicago) out of the car and forced them to stand in the rain as the dog sniffed in and around the car in a vain search for drugs. Based on this incident, the black lawyer sued the Maryland State Police. A settlement eventually was reached whereby the Maryland State Police agreed to cease using "race as a factor for the development of policies for stopping, detaining, and searching motorists." The state police also

agreed to maintain computer records for a three- year period of all stops in which a consent to search was given by a motorist stopped on any Maryland roadway and all stops in which a search by a drug-detecting dog is made.

Professor Harris reports in his article that the latest data track Maryland stops followed by consent searches and dog sniffs from January 1995 through June 1996. Of the 732 citizens detained and searched by the Maryland State Police, 75% were African-Americans, and 5% were Hispanics. The numbers showed that six officers stopped more than 80% African-Americans, one officer stopped more than 95% African-Americans, and two officers stopped only African-Americans. That this result occurred despite a lawsuit and settlement agreement based on similar conduct not only demonstrates that few people have been listening; it also shows that the challenged practice of targeting black and Hispanic motorists for drug searches continues despite denials of discriminatory intent.

The notion that the police can stop anyone for a traffic offense and use that stop as a pretext for searching for drugs or other contraband, while permissible under the holding in *Whren v. United States*, *supra*, is nonetheless troubling in the light of the information analyzed by Professor Harris. For countless African-American and Hispanic drivers, the prospect of being stopped for a traffic offense and asked to consent to a search of their vehicles has become part of the preparation for driving. As one whose interest in this issue is both professional and personal, and who knows the hostility that such police conduct has engendered — a hostility not limited, by the way, to minority communities — I am cautiously encouraged by the recent decision of the United States Supreme Court in *Knowles v. Iowa*, 119 S.Ct. 484 (1998). In that case, a unanimous Supreme Court held that the full search of a vehicle by an Iowa policeman who cited the motorist for speeding rather than arresting him violated the Fourth Amendment and could not be sustained under the "search incident to arrest" exception recognized in *United States v. Robinson*, 414 U.S. 218 (1973). I hope that decision will discourage police agencies

from engaging in the kind of traffic stops that are deemed pretexts to search for drugs or seize cash from motorists. In the meantime, however, I hope that police agencies will voluntarily discontinue the "highly disturbing" practice of suspecting that African-American and Hispanic motorists are more likely to be drug dealers and couriers so as to warrant being stopped for traffic offenses so that their vehicles can be searched and their cash seized.

The police had a valid basis for stopping appellant's vehicle for speeding in this case, and his conduct after being stopped justified the pat-down frisk that led to his arrest and the search of his vehicle. While I join the decision to affirm his conviction, I do not agree that Trooper Roberts would have been justified in undertaking a full search of appellant's vehicle based on the arrest for speeding alone. The Supreme Court has plainly held in *Knowles v. Iowa* to the contrary, thereby effectively overruling the decision of the Arkansas Supreme Court in *State v. Earl*, 333 Ark. 489, 970 S.W.2d 789 (1998). Appellant's invalid contention that his stop was pretextual and racially discriminatory does not undermine the possibility for similar arguments being made and reviewed on their merits in other cases. Our distaste for dealing with the issues of pretextual traffic stops and race discrimination must not blind us to the realities that are all too painfully known by many motorists, as Professor Harris has poignantly documented by his article.[1]

---

[1] Throughout this opinion I have referred to African-American and Hispanic drivers. By doing so, I do not suggest that only those drivers are concerned about traffic stops being pretexts for warrantless vehicular searches. Given the sad yet plain history of race discrimination in our society, and especially the well-documented pattern of unfavorable police attitudes and conduct towards minority communities, my concerns are probably applicable for Native-American and Asian drivers also. I restricted my remarks to African-American and Hispanic drivers because (a) those were the groups featured by Professor Harris, and (b) those are the minority drivers most frequently seen on Arkansas highways.