Richard A. EISNER, M.D., and Equivision *v.* Ron FIELDS

CA 98-1271 998 S.W.2d 421

Court of Appeals of Arkansas
Divisions III and IV
Substituted Opinion on Denial of Petition for Rehearing
delivered September 8, 1999

*Davis, Cox & Wright*, by: *Constance G. Clark* and *Walter B. Cox*, for appellants.

*Law Offices of Charles Karr, P.A.*, by: *Charles Karr* and *Shane Roughley*, for appellee.

S AM BIRD, Judge. On May 12, 1999, this court handed down an unpublished opinion in this case in which we reversed the judge's order granting appellee Ron Fields a new trial and dismissed the appeal. The appellee has filed a petition for rehearing, and, in response to that petition, we issue this substituted opinion and deny appellee's petition.

Appellee Ron Fields filed a lawsuit against Fort Smith ophthalmologist Richard Eisner and his clinic, Equivision, Inc., contending that Dr. Eisner committed medical malpractice when he negligently performed bilateral radial keratotomy surgery on appellee, resulting in the development of an infection in his left eye. Radial keratotomy surgery, commonly referred to as RK surgery, is performed to improve the vision of a person who is nearsighted. A jury sitting in the circuit court of Sebastian County returned a verdict absolving Dr. Eisner and his clinic of all liability. Following the entry of the judgment, appellee filed a motion for a new trial pursuant to Ark. R. Civ. P. 59. The circuit judge granted appellee's motion, stating that the jury's verdict was clearly contrary to the preponderance of the evidence. It is from the granting of that motion that appellants bring this appeal contending that the judge abused his discretion by granting a new trial. We agree that the judge abused his discretion, and we reverse and dismiss.

Appellee Fields testified at trial that he met with Dr. Eisner on December 16, 1994, to discuss the RK procedure and learn what results he could expect from the surgery. Appellee stated that he was nearsighted and wore glasses. During appellee's evaluation, Dr. Eisner discussed with appellee the use of an Excimer laser, which was a new technique. However, because the laser did not have FDA approval, Dr. Eisner recommended RK surgery. Appellee stated that Dr. Eisner told him that he would make eight incisions on each of his eyes and that if his vision did not improve to 20/20, Dr. Eisner would consider doing an "enhancement" surgery. Appellee stated that he understood that Dr. Eisner would perform eight cuts during the first surgery, and that if an enhancement was needed, Dr. Eisner would perform an additional eight cuts, for a total of sixteen cuts in each eye. Appellee testified that appellant informed him that, because appellee's right eye was con-

sidered to be much weaker than his left eye, in all likelihood he would need an enhancement on his right eye. Dr. Eisner also explained to appellee that he would prescribe medications after the surgery that would prevent infections and would cause the eye not to heal as quickly, which would allow appellee's eyeballs to adjust in the correct position before they became solidified.

On December 20, 1994, before Dr. Eisner performed surgery on appellee, appellee was shown a videotape that explained the procedure, the risks involved, and the results that could be obtained from the procedure. The videotape, which was introduced into evidence, stated that patients undergoing RK surgery are to use antibiotic eye drops for the first week after surgery to reduce the risk of infection. The tape also explained that an infection is always a possibility and could lead to blindness or the loss of an eye. It did state that the risk of those complications is rare.

After his surgery, appellee was given an antibiotic and a combination antibiotic and steroid, Tobradex, and he was told to return the next day for a follow-up visit. Appellee testified that his vision was substantially improved by the next day. However, he stated that his right eye began to get a little worse from visit to visit, but, overall, his vision was markedly improved. It was during the follow-up visits that Dr. Eisner began to tell appellee to use the medications less frequently.

Appellee's vision had improved, but it was not 20/20, so Dr. Eisner recommended enhancement surgery for both eyes, even though appellee's left eye was close to 20/20 vision. The enhancement surgery was performed on February 28, 1995. Afterward, Dr. Eisner asked appellee if he had any medication left from the earlier prescription, and appellee told him that he did. Dr. Eisner told him to take the medication so many times a day and then scheduled him for a follow-up appointment for the next week. Over the weekend, however, appellee stated that he ran out of Tobradex and he called the pharmacy for a refill, but the pharmacist could not refill the prescription without a doctor's permission. Appellee stated that he was not concerned since he had an appointment that following Tuesday, March 7.

Appellee said that when he returned on that Tuesday, it was clear that he did not have much improvement in his left eye. Dr. Eisner asked if he had been taking the medication, and appellee told him no, that he had run out. At that point, Dr. Eisner told him he was going to try something, and Dr. Eisner began "going around the eyeball, pressing, and it felt like a stick that he had his thumbs on and was just pressing into the eyeball. As I recall it was direct pressure on the eyeball . . . ." This procedure is known as compression keratoplasty. Dr. Eisner refilled the prescription for Tobradex and told appellee to begin taking it again. Appellee went in for another check-up on March 16, and Dr. Eisner told him that scar tissue that appellee already had in his left eye looked larger and that Dr. Eisner wanted to watch that. He was rescheduled for an appointment in three weeks. However, appellee returned on March 21 complaining of a burning, scratchy sensation in his eye. Plus, he said his vision was much worse and getting blurry. Dr. Eisner commented that appellee's scar tissue looked even larger, so he asked to see him the next day.

By the next day, appellee said he was having a lot of trouble seeing out of his eye, which was also extremely red, very painful, and extremely sensitive to light. It was during that visit that Dr. Eisner detected an infection. He referred appellee to Dr. Thomas Wolf, an ophthalmologist with the Dean A. McGee Eye Institute in Oklahoma City, and told him to go there immediately. Appellee was admitted to the hospital in Oklahoma City that night. He said that at that point, he was taking a lot of pain killers because the pain was intense. He was discharged, returned home, and saw Dr. Eisner almost daily for the next few weeks. He was also taking medication every thirty minutes "around the clock."

Appellee was informed by Dr. Eisner's partner, Dr. Larry Bone, that he needed to return to Oklahoma City because his eye was getting worse. He was readmitted to the hospital on April 4, and Dr. Wolf brought in another doctor to diagnose appellee. Dr. Jim Kirk, an infectious disease expert, was the one who informed appellee that the infection in his eye was caused by Mycobacterium chelonei, which is very rare. Even though there was no known cure for the infection, Dr. Kirk suggested trying to stop the infection by using experimental drugs. However, Dr. Kirk

was not optimistic and told appellee that there was a great possibility that he would need a cornea transplant. In the meantime, Dr. Wolf requested that appellee come to Oklahoma City every other day for check-ups. After many follow-up visits and various complications, seven weeks later Dr. Wolf stated that appellee was healed.

During the time that he was being treated in Oklahoma City, appellee was still seeing Dr. Eisner because Dr. Wolf had wanted appellant hospitalized, but stated that since he would be far from home, he would allow him to travel back and forth on the condition that appellee had someone in Fort Smith check on him as an "early warning system."

Appellee testified on cross-examination that the bacteria he had contracted was very rare and that there had not been more than twenty cases reported worldwide. He also stated that he realized that after the surgery infection was a risk and that if he developed an infection, it could lead to a total loss of vision or loss of the eye.

Appellee also presented the testimony of Dr. Michael Insler, a professor of ophthalmology at Louisiana State University. He stated that appellee had severe nearsightedness that is hard to eliminate with RK surgery. Therefore, he testified, appellee was not a good candidate for RK and that Dr. Eisner breached the standard of care in performing RK surgery on appellee because appellee had such a severe case of nearsightedness. He also stated that because the Excimer laser was about to be approved by the FDA, very few doctors would have recommended appellee for RK surgery. In addition, he stated that an enhancement should not have been performed on the left eye because it was improving on its own; to do the enhancement surgery was a violation of the standard of care.

As to what caused the infection, Dr. Insler stated:

> As far as whether I have an opinion within a reasonable degree of medical certainty as to what caused that infection, I think it is going to be difficult to prove where the infection came from because it is a very abnormal infection, but I think there is a greater probability that it occurred either during the enhance-

ment procedure, since it involved one of the enhancement incisions, or it occurred during the compression keratoplasty.

. . . .

I am going to tell the jury that I think that most likely the infection came from somewhere in Dr. Eisner's clinic. Until the epithelium heals, the eye is susceptible to infection. The epithelium generally will heal up in a few days, two, three or four days. It is exactly right that until the epithelium heals and closes over, there is a risk of that epithelium being invaded by a bug such as M.chelonei or some other microbacterium. As long as there is a scratch or defect or abrasion, that puts the patient at risk for an infection.

. . . .

As far as whether Mr. Fields could have been in contact with the microbacterium at any point within the next few days after he left Dr. Eisner's office, anything is possible, but that is not likely what happened. Anything is possible, but name me what he would have done at home or outside the office to come in contact with this very abnormally difficult microbacterium.

I do not know where the bug came from. Chances are it came from the office. Bacteria are most commonly transferred from person to person by the hands. This is an environmental pathogen, known to live in different solutions, even disinfecting solutions.

He also stated that, if appellee had not had the surgery, he would not have had the infection. Then he stated that he was certain that the infection occurred either from the enhancement on February 28 or the compression keratoplasty on March 7. He stated that it is common for patients who develop eye infections to do so in the out-patient surgical facility where the doctor performs the surgery. He stated during cross-examination that the fact that appellee ran out of Tobradex was not a factor in the cause of the infection. He stated that he did not fault Dr. Eisner for not prescribing different medications.

The appellants then presented their case and began with the deposition testimony of Dr. Wolf. Dr. Wolf stated that he first treated the appellee on March 22 at the Presbyterian Hospital's emergency room in Oklahoma City, after appellee was referred to

him by Dr. Eisner. Dr. Wolf said that he was not sure how or when the appellee came into contact with the bacteria that caused the infection, but wearing contact lenses or having trauma or surgery to the eye breaks down the barrier that protects the eye. He said that appellee could have had the bacteria on his eye lids when the surgery was performed and with that barrier broken, the infection could have gotten in the eye.

Dr. Wolf also stated many times during his testimony that an infection is a recognized risk from RK surgery. He stated: "The fact that a patient such as Mr. Fields contracts an infection in the eye following RK surgery does not signify or suggest that there was negligence in the performing of the surgery. There is always the risk of infection any time you make a wound."

Dr. Wolf last saw appellee as an outpatient on November 27, 1996, and he agreed that appellee had healed. Dr. Wolf stated that since appellee was discharged, appellee has complained of blurry vision, but that the majority of appellee's complaints are "probably more related to the RK. . . . It is possible that some or all of those symptoms may have existed simply because he had refractive surgery, even if the infection had never occurred." In addition, Dr. Wolf stated that appellee would probably not need a cornea transplant.

Dr. Eisner testified on his own behalf that he first met appellee on December 16, 1994, when appellee came to his office for a refractive evaluation, and that appellee was a good candidate for RK surgery. He also stated that at the time of appellee's surgery, the Excimer laser had not been approved by the FDA and that the only type of corrective surgery for nearsightedness was RK surgery.

In regard to the infection, Dr. Eisner stated that he had performed more than 1,000 RK procedures and he had never had another patient develop the infection that appellee developed. Furthermore, Dr. Eisner's partner at the clinic, Dr. Larry Bone, with whom he shared an operating room and equipment, had also never had one of his patients develop an M.chelonei infection. Dr. Eisner testified that he and Dr. Bone sterilized their instruments by steam heat rather than by placing them in a disinfectant.

Dr. Eisner stated that he did not know of anything that he did to cause the infection and that he does not believe that the "bug" was in his office.

As for appellee's contention that he was not informed of the enhancement procedure, Dr. Eisner stated that after a couple of months had passed since the first RK procedure, he considered performing an enhancement surgery. He stated that he had that discussion with appellee and that appellee understood that the enhancement procedure carried the same risks and complication rate that the original procedure carried. The enhancement procedure was performed in the same operating room as the original RK procedure had been performed.

Dr. Eisner also testified that he did not believe that the compression keratoplasty was the cause of appellee's infection. He stated that he used a sterile cotton tip applicator when he performed the procedure on March 7, and when appellee returned on March 16, there were no complications, his incisions looked fine, and there was no hint of infection. Dr. Eisner stated that he asked appellee to return in three weeks, but that he returned in five days. At that time, Dr. Eisner noticed that something appeared strange. The next day appellee returned, and Dr. Eisner realized that he had a possible infection and referred him immediately to Dr. Wolf. He stated that he continued to monitor appellee for local care while he was in Dr. Wolf's care.

On cross-examination, Dr. Eisner stated that he believed that the infection was around the incision that he performed when doing the enhancement surgery. He stated that when he did the compression keratoplasty, he put an anesthetic drop in appellee's eye, but that it was common practice not to note that in his patients' charts. He stated that he put the anesthetic drops, used to numb the eye, on the end of the Q-tip and did not dip the Q-tip in the solution. He stated that although he does not believe that the compression keratoplasty caused the infection, he admitted that since he performed the procedure on appellee, he had read an article about a patient who had developed an infection two weeks after the procedure, which was the amount of time that had

elapsed in appellee's case between the compression keratoplasty procedure and detection of the infection.

Dr. Lee Nordan, an eye surgeon in San Diego, California, was the final witness to testify on behalf of the appellants. He testified that appellee's vision was improved since his RK surgery and that it was not a breach of the standard of care for Dr. Eisner to perform RK surgery on appellee. Dr. Nordan stated that infections are a risk that the patient takes when undergoing eye surgery, that he was familiar with the bacteria that caused appellee's infection, and that it is very rare. He also stated that there was no way to tell to any degree of reasonable certainty where the microbacterium came from. Further he stated that, had the bacteria been common at Dr. Eisner's clinic, other patients at the clinic would have developed the infection. Dr. Nordan testified that there will probably never be an answer as to where the bacteria came from. However, he did state that he did not believe that the compression keratoplasty was the cause of the infection and that, most likely, the infection also did not come from the sterile Q-tip.

On cross-examination, Dr. Nordan testified that he did not have an opinion to a reasonable degree of medical certainty as to the cause of appellee's eye infection, but that anytime the epithelium is broken, there is a chance of an infection. He stated that the epithelium can be broken simply by rubbing an eye; however he stated that the epithelium would not break during compression keratoplasty because the physician is pushing on the eye and that does not break the epithelium. He also stated that there is a risk of getting an infection by wearing contact lenses.

In summary, he testified:

> But this Mycobacterium, this bug, is so rare that there is no way that you could say with any kind of medical certainty that you would expect to get it or where you got it from. It is just a very unfortunate, rare event that could not be prevented, whether you are wearing contact lenses or having the surgery.

The jury rendered a verdict for appellants, and the trial judge entered an order granting a new trial by stating only that the verdict was clearly contrary to the preponderance of the evidence. The law affecting the granting of a new trial and appellate review

is well settled. A trial court may not substitute its own view of the evidence for that of the jury and grant a new trial unless the verdict is clearly against the preponderance of the evidence. *Razorback Cab v. Martin*, 313 Ark. 445, 856 S.W.2d 2 (1993); *Clayton v. Wagnon*, 276 Ark. 124, 633 S.W.2d 19 (1982). The test we apply on review of the granting of a motion for a new trial is whether the trial court abused its discretion. *Razorback Cab v. Martin, supra; Schrader v. Bell*, 301 Ark. 38, 781 S.W.2d 466 (1989). An abuse of discretion in granting a new trial means discretion improvidently exercised, *i.e.*, exercised thoughtlessly and without due consideration. *Razorback Cab v. Martin, supra; Clayton v. Wagnon, supra*. A showing of an abuse of discretion is more difficult when a new trial has been granted because the party opposing the motion will have another opportunity to prevail. *Arkansas Power & Light Co. v. Bolls*, 48 Ark. App. 23, 888 S.W.2d 319 (1994); *Razorback Cab v. Martin, supra*. However, the trial court is not to substitute its view of the evidence for that of the jury. *Razorback Cab v. Martin, supra; Clayton v. Wagnon, supra*.

In the case at bar, we find that the trial judge abused his discretion in granting a new trial on the grounds that the verdict was clearly contrary to the preponderance of the evidence. Even if the jury had found that Dr. Eisner was negligent, which we cannot say that it did, it could have determined also that Dr. Eisner's negligence was not the cause of appellee's eye infection. There was evidence from which the jury could have found that appellee's eye infection was contracted at a place other than Dr. Eisner's clinic. Four doctors testified in the case, including Dr. Eisner, all of whom stated that they did not know where or how appellee came into contact with the bacteria that caused the infection. Appellee argues that his expert witness, Dr. Insler, testified to a reasonable degree of medical certainty that appellee contracted the bacteria at Dr. Eisner's officer either during the enhancement procedure or during the compression keratoplasty. However, Dr. Insler also stated that "I can't exactly prove where the infection came from, but I believe that it came from the office."

Appellant testified that he had performed 1,000 RK surgeries and that none of his other patients had contracted the infection. In addition, he stated that his partner used the same surgical

equipment and surgery room and that none of his patients had contracted the infection. Other experts stated that it is nearly impossible to prove where appellee contracted the infection and that, even though they had not performed the compression keratoplasty, they did not think that the procedure would produce the infection. In addition, Dr. Eisner stated that he used a sterile Q-tip to perform the procedure. All of the witnesses testified that the infection is very rare, and appellee testified that there were probably only twenty cases ever reported in the United States.

■ The jury heard the testimony of the expert witnesses, absolved the appellants of any liability, and we cannot agree with the trial court that the verdict was clearly against the preponderance of the evidence. To the contrary, there was testimony of a substantial nature that supported the verdict and that was at least the equivalent of any countervailing evidence. In the court's order, the judge simply stated that the verdict was clearly contrary to the preponderance of the evidence, a conclusion we are unable to reconcile with the testimony of the witnesses. Having only the trial court's conclusion, without any elaboration or reference to the evidence that he found to be contrary to the verdict, we are of the opinion that the trial court substituted its view of the evidence for that of the jury and an abuse of discretion has resulted. *See Razorback Cab v. Martin, supra.*

The appellee also contended that a new trial was appropriate because the judge erred in refusing to give a jury instruction on *res ipsa loquitur* and because the judge erred in giving jury instruction AMI Civ. 3d 603. The appellee argued that even though the judge did not include these errors in his order granting a new trial, that does not preclude our court from considering the errors as grounds for affirmance on appeal. For this proposition, the appellee cited *Toney v. Miller,* 268 Ark. 795, 597 S.W.2d 102 (Ark. App. 1980).

In our original opinion, we addressed appellants' argument that the judge erred in granting a new trial when he stated that the jury's verdict was clearly against the preponderance of the evidence. We said:

Appellee asks this court to affirm the trial court's ruling for other reasons, stating that the court erred in instructing the jury. We will not consider those arguments because the court's ruling was that the verdict was contrary to the preponderance of the evidence, rather than because an error was committed while instructing the jury.

. . .

In the case at bar, the circuit court reached the wrong result in granting a new trial. Further, this court will not search for any ground upon which a new trial could have been granted. *General Motors Corp. v. Tate*, 257 Ark. 347, 516 S.W.2d 602 (1974). In *Tate*, the trial judge granted a new trial without stating a specific ground. The court wrote, "It is generally conceded that, in the interest of good practice and the proper dispatch of judicial business, courts should specify in orders granting new trials, with particularity the grounds on which the order was made." *Id.* at 359, 516 S.W.2d at 610. The rule that this court will not search for any ground upon which to grant a new trial was promulgated to improve the administration of justice by eliminating the problem of "exploring every possible facet of the case to determine whether there has been an abuse of the trial court's discretion." *Id.* at 359, 516 S.W.2d at 610.

The appellee has filed a petition for rehearing, arguing that this court erred by disregarding the general rule that this court may affirm the trial court when the trial court reaches the right result for the wrong reason. He states that the trial court was correct in granting a new trial because it erred in not allowing a *res ipsa loquitur* jury instruction and it erred in instructing the jury with AMI Civ. 3d 603. Citing *Toney v. Miller, supra*, as precedent, the appellee states that this court should address those issues as they were before the trial court and before this court in the original appeal, even though they were not included in the court's order granting a new trial.

The rule relied upon in our original opinion was set forth in *General Motors v. Tate, supra* and by a per curiam order, *In the Matter of Procedure in Granting New Trials*, 257 Ark. 1064 (1974), and promulgated as Rule 16 of the Uniform Rules of Procedure for Circuit, Chancery and Probate Courts. That rule stated:

Whenever a trial court grants a new trial, the court shall state, with particularity, the specific ground or grounds for its decision in its order granting the new trial. Appellate review will be limited to the grounds stated in the order. On appeal, in any case in which the requirements of this rule have not been met, the presumption will be that the verdict of the jury or the finding of the trial court sitting as a jury was correct and the burden will be on appellee to show that the trial court did not err in granting a new trial; however, appellee, before filing his brief, may move to remand the case to the trial court for compliance with this rule.

In 1980, in contradiction to that rule, our court published *Toney v. Miller, supra*, which stated:

The failure of the trial court to include this error as a reason for granting a new trial does not preclude our considering the erroneous instruction as a ground for affirmance on appeal.

268 Ark. at 799, 597 S.W.2d at 105.

■ Because *Toney v. Miller, supra*, was not good law when it was published, in that it contradicted Rule 16, we refuse to accept it as good law today, and we overrule that case in so much as it contradicted Rule 16.

In 1988, the court abolished the Uniform Rules, *see In Re: Abolishment of the Uniform Rules of Circuit and Chancery Courts*, 294 Ark. 664, 742 S.W.2d 551 (1987), thus abolishing Rule 16. In 1996, the court addressed the issue in *Young v. Honeycutt*, 324 Ark. 120, 123, 919 S.W.2d 216, 218 (1996), and it held:

Young first contends that the trial judge's order granting the new trial is deficient because it does not include a "finding" that the jury's verdict was clearly contrary to the preponderance of the evidence. Before the Uniform Rules for Circuit and Chancery Court were abolished in 1988, see *In Re: Abolishment of the Uniform Rules of Circuit and Chancery Courts*, 294 Ark. 664, 742 S.W.2d 551 (1987), Rule 16 required judges to state, with particularity, the specific reasons for their decision in their order granting the new trial. If they failed to do so, there was a presumption on appeal that the jury's verdict was correct. *See e.g., Stephens v. Saunders*, 293 Ark. 279, 737 S.W.2d 626 (1987); *Brant v. Sorrels* [Sorrells], 293 Ark. 276, 737 S.W.2d 450 (1987). There is no

such requirement present in Arkansas Rules of Civil Procedure; thus, Young's argument is without merit.

■ Because Rule 16 has been abolished and in light of the supreme court's holding in *Young v. Honeycutt, supra*, we will address appellee's two contentions that the court erred in failing to give a *res ipsa loquitur* instruction and erred in giving AMI Civ. 3d 603 jury instruction, which states that an occurrence of an accident is not, of itself, evidence of negligence.

The appellee asserts that the motion for a new trial was properly granted because the trial court erred in not giving his proposed *res ipsa loquitur* instruction. He argues that appellants owed appellee a duty of due care and that the infection was caused either during the enhancement procedure or during the compression keratoplasty. He asserts that Dr. Eisner was in complete control of both procedures and the instruments used to carry out those procedures. And, he argues that there was nothing that he could have done to have caused the infection. We do not agree.

■ The supreme court has held that the doctrine of *res ipsa loquitur* may apply in medical malpractice cases if the essential elements for application of the doctrine exist. *Schmidt v. Gibbs*, 305 Ark. 383, 807 S.W.2d 928 (1991). The doctrine of *res ipsa loquitur* may be given as a jury instruction when:

> 1. The defendant owes a duty to the plaintiff to use due care; 2. The accident is caused by the thing or instrumentality under the control of the defendant; 3. The accident that caused the injury is one that, in the ordinary course of things, would not occur if those having control and management of the instrumentality used proper care; 4. There is an absence of evidence to the contrary.

*Id.* at 387, 807 S.W.2d 931.

■ If each of these elements is present, then the accident from which the injury results is prima facie evidence of negligence. At that point, the burden shifts to the defendant to prove that the injury was not caused through any lack of care on its part. *Id.* A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in evidence to support

the giving of the instruction. *Coca-Cola Bottling Co. v. Priddy*, 328 Ark. 666, 945 S.W.2d 355 (1997).

Based upon the testimony presented at the trial, we cannot say that the judge abused his discretion in not giving the instruction. Dr. Insler, appellee's expert witness stated,

> As far as whether I have an opinion within a reasonable degree of medical certainty as to what caused that infection, I think it is going to be difficult to prove where the infection came from because it is a very abnormal infection. . . . I'm going to tell the jury that I think that most likely the infection came from somewhere in Dr. Eisner's clinic. . . . As far as whether Mr. Fields could have been in contact with the microbacteium at any point within the next few days after he left Dr. Eisner's office, anything is possible, but that is not likely what happened. . . .

Dr. Wolfe, one of appellee's physicians, stated that he was not sure how or when the appellee came into contract with the bacteria that caused the infection, that the appellee could have had the bacteria on his eye lids when the surgery was performed and that with the epithelial barrier broken, the infection could have gotten into the eye. Dr. Eisner testified that he did not know of anything that he did to cause the infection and that he does not believe that the bug was in his office. Dr. Lee Nordan, an expert witness presented by appellants, stated that there was no way to tell to any degree of reasonable certainty from where the microbacterium came. He also stated that he did not believe that it was caused by the compression keratoplasty.

 It is clear that a duty of care was owed by appellants to appellee; however, based upon this evidence, we cannot say that the judge abused his discretion in not allowing the instruction because there was substantial evidence that the infection was not caused by the thing or instrumentality under the control of the appellant, and that appellee could have contracted the infection at a place other than Dr. Eisner's clinic.

Appellee also asserts that the court was correct in granting a new trial because it erroneously instructed the jury that the fact that an injury has occurred is not, of itself, evidence of negligence on the part of anyone. This instruction is AMI Civ. 3d 603. Appellee contends that the instruction is unconstitutional because

it is a comment on the evidence, and it requires the jury to draw an inference and it is impermissible for the trial court to instruct the jury to draw an inference. Moreover, appellee suggests that this court should "abolish AMI 603." He also argues that *Lambert v. Markley*, 255 Ark. 851, 503 S.W.2d 162 (1973), is on point in this case and it held that when a case is submitted to a jury only upon the issue of *res ipsa loquitur* and ordinary care, it is proper for the trial court to decline to give AMI Civ. 3d 603.

The supreme court has held that AMI Civ. 3d 603 is a correct statement of the law. *See Taylor v. Riddell*, 320 Ark. 394, 896 S.W.2d 891 (1995), and *Pilkington v. Riley*, 271 Ark. 746, 610 S.W.2d 570 (1981). This court cannot overrule a decision by the supreme court and thereby abolish AMI 603. *Kearse v. State*, 65 Ark. App. 144, 986 S.W.2d 423 (1999).

Further, unlike *Lambert v. Markley, supra*, appellee's case was not submitted solely on the doctrine of *res ipsa loquitur*. Appellee asserted other acts of negligence, including that appellants failed to obtain informed consent, that appellee was not a good candidate for the surgeries, and for failing to inform appellee of the risks involved in the surgeries.

Based upon the foregoing, we cannot say that the judge abused his discretion by instructing the jury that just because an injury occurred, it was not, in and of itself, evidence of negligence. The jury was allowed to consider whether an injury occurred in its assessment of whether appellants were liable for damages. The jury simply was not allowed to consider the fact that the injury occurred to be, in and of itself, evidence of negligence.

Therefore, because we find that the judge did not err in refusing to instruct the jury on the doctrine of *res ipsa loquitur*, that he did not err in giving the jury instruction AMI Civ. 3d 603, but that he did err in finding that the evidence was clearly contrary to the preponderance of the evidence, we reverse the judge's order granting a new trial, and we dismiss the appeal.

Reversed and dismissed.

ROBBINS, C.J., and PITTMAN, HART, NEAL, CRABTREE, JJ., agree.